DECKERS OUTDOOR CORP.,

     Plaintiff/Counter-Defendant,

v.

AUSTRALIAN LEATHER PTY. LTD. and
ADNAN OYGUR a/k/a EDDIE OYGUR,

     Defendants/Counter-Plaintiffs.

No. 16 CV 3676

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Deckers Outdoor Corp., the company that owns the popular UGG brand, filed this lawsuit against Australian Leather Pty. Ltd., and its owner, Adnan Oygur, asserting claims for trademark and design patent infringement, because Australian Leather sells boots called "ugg boots." Defendants filed counterclaims and affirmative defenses, asserting, among other things, that Deckers's trademarks containing the word UGG should be canceled or that Deckers should be barred from enforcing them. Defendants say that ugg is a generic term for a kind of sheepskin boot, one popularized by Australian surfers in the 1970s, and therefore, Deckers cannot stop them from calling their boots uggs in the United States.

The parties filed cross-motions for summary judgment on some of defendants' counterclaims and affirmative defenses. For the reasons discussed below, Deckers's motion is granted in part, denied in part, and Australian Leather's motion is denied.

## I. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: we construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 F. App'x 92, 95 (7th Cir. 2012).

## II. Analysis

Deckers and Australian Leather each move for summary judgment on Australian Leather's counterclaims for declaratory judgment that the mark UGG is unenforceable and for cancellation of Deckers's trademark registrations. Deckers moves for summary judgment on Australian Leather's counterclaims for false designation of origin, false statements in violation of the Lanham Act, fraudulent

procurement of trademark registrations, a violation of the Illinois Uniform Deceptive Trade Practices Act, and a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. Deckers also moves for summary judgment on four of Australian Leather's[1] affirmative defenses that have overlapping issues with the subject counterclaims: that ugg is a generic term in the U.S., that it is generic in Australia, that it should be treated as generic in the U.S. pursuant to the foreign equivalents doctrine, and that Deckers fraudulently obtained its trademark registrations.

### A.    Generic Status and the Foreign Equivalents Doctrine

A generic term is one which is commonly used as the name or description of a kind of good. *Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, 561 F.2d 75, 79 (7th Cir. 1977) (citing *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 528 (1924)). And a generic term "cannot become a trademark under any circumstances." *Id*. Though a federally registered trademark is presumptively valid, 15 U.S.C. § 1115, if at any time a "registered mark becomes the generic name for the goods or services," an affected party can petition to cancel the registration. 15 U.S.C. § 1064(3). In determining whether a mark has become generic, the "primary significance of the registered mark to the relevant public rather than the purchaser motivation shall be the test." *Id*. Under the doctrine of foreign equivalents, one cannot obtain a trademark over a foreign generic word if the trademark designation "would prevent competitors

---

[1] Because, as relevant here, Australian Leather and Oygur's affirmative defenses are the same, I refer to them collectively as Australian Leather.

from designating a product as what it is in the foreign language their customers know best." *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 271 (2d Cir. 1999). Australian Leather argues that the term ugg is generic in the United States both because American surfers understood the term to refer to sheepskin boots generally and because its generic status in Australia, combined with the foreign equivalents doctrine, warrants generic status in the United States.[2]

### 1. The UGG Brand

Brian Smith, who was born in Australia and moved to the United States in 1978, founded the sheepskin-boot company known today as UGG. [189] ¶¶ 5, 10.[3]

---

[2] Both parties raise objections throughout that relate to the relevance of evidence presented. Many of these objections stem from the parties' central disagreement about how to define the relevant class of purchasers, which matters when considering consumer perceptions to determine whether the term was generic. For reasons discussed below, I conclude that the relevant consumer perceptions are those of American footwear consumers generally. For that reason, evidence from non-surfer consumers is relevant. And though the test centers on American perceptions, the Australian experience is not irrelevant to that determination. *See G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 1000 n. 15 (7th Cir. 1989). Because many early players in the American sheepskin boot business had ties to Australia, this information provides helpful context. As to the relevant time period, a trademark is subject to cancellation at any time if it becomes generic. As a result, post-1979—the date Deckers asserts it first used the UGG trademark—evidence is relevant as well.

[3] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from plaintiff's response to defendants' Local Rule 56.1 statement of facts, [173], and defendants' response to plaintiff's LR 56.1 statement of additional facts, [189], where the asserted fact and accompanying response are set forth in the same document. Any document previously filed under seal and referenced in this opinion shall be unsealed; by October 11, 2018, the parties shall file a joint statement identifying the docket entries for unsealing or stating a basis for continued secrecy. *See Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir. 2002) ("In civil litigation only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault), is entitled to be kept secret on appeal."). If any filing remains under seal, the filer must ensure there is a public version of the document with appropriate redactions.

Smith owned a pair of sheepskin boots while still living in Australia, and he and others referred to them generally as ugg[4] boots. [173] ¶ 19.[5] Once he moved to the United States, specifically in December 1979, Smith began purchasing boots from an Australian company, Country Leather, and reselling them in the United States under the name Country Leather America. [189] ¶ 5; [141] ¶ 7.[6] Smith bought six pairs of sample boots, followed by an additional 500 pairs, which had a sewed-on label that read, "Country Leather" and a hang tag with the phrase, "Ugg Boots keep you Warm & Happy." [214] ¶ 69. Smith knew that another individual had trademarked the term "Ugh Boots" for sheepskin boots in Australia in the early 1970s. [189] ¶ 12. In early 1980, Smith applied to register UGG as a trademark in the United States, listing December 28, 1979, as the first-use date. [214] ¶ 70; [189] ¶ 6. The Trademark Office rejected the application because the mark did not "serve to identify and distinguish applicant's goods," and Smith did not reapply. *Id.* In April 1980, Smith—on behalf of UGG Imports—agreed to be the sole agent and distributor for Country Leather's

---

[4] I use all capital letters (UGG) when referring to the brand or companies Smith founded. I use lowercase letters (ugg) when referring to sheepskin boots generally. I stray from this convention when quoting from an advertisement or other written material to accurately reflect the content of the cited source, and in those instances, I put the term in quotation marks.

[5] The additional information in Deckers's response to Australian Leather's statement of facts does not refute Australian Leather's assertion, in violation of LR 56.1, and I disregard it.

[6] The parties dispute whether these boots were sold under the UGG brand or trademark. An invoice refers to the items as "Short UGG Boot" and "Tall UGG Boot." [154-13] at 53. Viewing the facts in the light most favorable to Australian Leather, as is necessary when considering Deckers's motion for summary judgment, the word may have been used in the generic sense on this invoice, despite the all-capitals.

sheepskin products in the U.S. *See* [141-3] at 3.[7] A few years later, Smith made a third order for about 2,200 pairs of boots. [214] ¶ 69.

In its early years, UGG Imports was just Smith and his partner, Doug Jensen. [189] ¶ 9. In the first year of business, both Smith and Jensen attempted to sell UGG footwear to surf and ski shops, as well as shoe stores. *Id*. Smith visited 50 surf shops that year, and some shop owners referred to the boots as ugg boots without prompting. *Id*. ¶ 10. In a speech, Smith described his first two attempts at selling to surf-shop owners as follows: "And the first store I walked into, I was super nervous and really timid, and I open up the bag, and—and the guy goes, 'Ah, UGG boots, man. They're fantastic. . . . I got a pair. Buddy brought them back for me.' And next store I went to was, 'Oh UGG boots. Yeah my buddies have all got those. They swear by them.'" *Id*. ¶ 11.[8] Smith and Jensen had similar reactions from other shops as well. [214] ¶ 63. The parties disagree about the extent to which shop owners were familiar with the term ugg and whether they used it in a generic sense. Viewing the facts in light most favorable to Australian Leather, some shop owners were familiar with the term and used it generically, to refer to the style of the boots, and not in reference to Smith's company.

---

[7] The parties dispute whether, as a result of this agreement, Ugg Imports acquired any rights that Country Leather had in the trademark UGG in the United States by virtue of Country Leather's 1979 advertisements in *Surfer* magazine. Because the letters themselves do not so provide, *see* [141-3]; [141-4], I treat this fact as disputed and view it in Australian Leather's favor, which is that Ugg Imports did not acquire any rights from those advertisements.

[8] When someone spoke of the term it was not clear whether that person was referencing the spelling ugg, ugh, or ug. *Id*. ¶ 12.

In an interview, Smith said that surfers "all knew of UGG in some way before I even started, and that's really why I did it. They already had a recognition in the surf market." *Id.* ¶ 64. Though some shop owners and surfers were familiar with the term, customers generally were not. [189] ¶ 12. In addition to targeting surf and ski shops, Smith and Jensen sold their products at flea markets, swap meets, farmers markets, and from Smith's van. *Id.* ¶ 9. Smith also attended ski shows in Las Vegas, where other companies selling sheepskin boots used the word ugg in their company name. [173] ¶ 51.[9]

By 1983, UGG Imports had advertised in major national publications such as *Surfer* magazine and *Action Sport Retailer*, received inquiries from over 105 retail stores, and made 384 separate invoice sales to retailers all over the United States. [189] ¶ 13. Deckers acquired UGG Holdings (the successor to UGG Imports) and its UGG trademark in 1995. *Id.* ¶ 18. After Deckers acquired the UGG brand, it repositioned it as a luxury brand and sold its products in well-known department stores and through other third-party retailers, along with its own UGG concept stores and online. *Id.* ¶ 19. Deckers spent tens of millions of dollars in advertising campaigns in fashion magazines during the early 2000s, and media outlets, movies, and TV shows featured UGG products. *Id.* ¶¶ 22–26. The brand became a favorite among celebrities, received various awards, and had over $1 billion in global annual

---

[9] Smith did not recall seeing the specific company names that Australian Leather asserted, and he could not recall the date of the ski show, but he did indicate that at the shows he attended other companies used the word ugg in their names. [161] at 122:15–123:22; [173] ¶ 51.

sales every year since 2011. *Id*. ¶¶ 24–26. The UGG product line came to include a wide range of footwear and apparel for men, women, and children; handbags; accessories; and home goods. *Id*. ¶ 20.

### 2. Other Sheepskin Boot Retailers

Four Australian boot-suppliers testified about their experiences selling sheepskin boots to U.S. customers. *Id*. ¶ 48.[10] John Arnold sold sheepskin boots (which he referred to as ugg boots) in the U.S. in the 1960s and early 1970s, selling thousands of pairs per week. *Id*. ¶ 50; [204] ¶ 55. Arnold used the boots as packing material in his shipments of surfboards. [189] ¶ 51. He sold mostly to surf shops and did not sell to mainstream footwear shops. *Id*. Roger Bosley, an Australian who was in the sheepskin business from 1973–84, traveled to the U.S. in 1979 in hopes of selling boots, but found Americans were not interested. [189] ¶ 53; [173] ¶ 15; [136-21] at 16:23–19:23. A year later, Bosley opened four retail shops in Los Angeles, which he operated for a little under two years, where he sold sheepskin boots under a cardboard sign that read "UGG BOOTS." [189] ¶¶ 54–55; [173] ¶ 50.[11] Bosley stated that ugg had always been a generic term in Australia. [173] ¶ 15; [136-21] at 25:7–

---

[10] Deckers points out that none of these individuals provided any documentation of the sales they made. *See id*. Nonetheless, their assertions are treated as true at the summary-judgment stage.

[11] Deckers notes that Bosley's company catalog described the boots as "sheepskin footwear" and did not refer to them as uggs. But Bosley testified that he sold them under a sign labeling them uggs, and at this stage, because his testimony is favorable to Australian Leather, and he has personal knowledge of the sign he used, I treat it as true.

19.[12] An Australian sheep slaughterer and tanner, Peter Dorizzi, sold sheepskin boots to visiting American sailors. [189] ¶ 57. He first attempted selling his boots wholesale to stores in the U.S. in 1980 but was unsuccessful. *Id*. In 1983, he sold "probably" 800 pairs at the 1983 America's Cup and then sold 40–50 leftover pairs in California. *Id*. ¶ 59. Dorizzi believed that ugg was a generic term and that all manufacturers used it to describe sheepskin boots. [173] ¶ 13; [136-19] at 40: 2–7. Robert Hayter also tried to sell sheepskin boots at the 1983 America's Cup, but was unable to sell many pairs and was disappointed in the response in America. [189] ¶ 62. According to Hayter, the term ugg boot "didn't mean much to [American customers] at all." *Id*. ¶ 64.[13] Oygur—Australian Leather's owner—purchased a pair of sheepskin boots as an eleven-year-old boy in Australia in 1971, and said that back then, everyone called them ugg boots. [173] ¶ 17.

American surf-shop owners started selling sheepskin boots in their shops in the late 1960s. Terry McKendree, who owned two surf shops in Jacksonville, Florida in the late 1960s and early 1970s, imported sheepskin boots from Australia to sell in his own shops. [189] ¶ 65. McKendree also arranged sales for other U.S. shops. [173] ¶ 49; [136-22] at 34:7–12. He first learned about sheepskin boots during a 1969 trip to Australia, where surfers wore them to warm their feet after surfing in cold water.

---

[12] Contrary to Deckers's objection, Australian Leather's assertion that Bosley testified that ugg boots has always been a generic term in Australia is supported by cited testimony. *See* [136-21] at 25:7–19.

[13] Australian Leather asserts that Hayter testified that the term ugg was generic in Australia, but the cited testimony does not support this assertion. [173] ¶ 14; [136-20] at 148:5–14. Hayter merely agreed that a document being presented to him stated that ugg was generic; it does not show that he believed the term was generic. *Id*.

[173] ¶ 16; [214] ¶ 53. At that time, people in Australia used the term ugg to describe the type of boots. *Id*. The boots McKendree sold were marked "Made in Australia" and sold out of a bin in his stores labeled "UGG boots." [189] ¶ 66. At the time he sold the boots, McKendree considered ugg to be generic. [214] ¶ 58. McKendree placed an ad in *Surfing* magazine in the February 1970 issue, advertising "Australian Sandals." *Id*.; [189] ¶ 67. The ad displayed six pieces of footwear, one of which was a sheepskin boot labeled "UGG BOOT." [189] ¶ 67. Aside from the ad in *Surfing* magazine, two other pre-1979 U.S. advertisements used the term "UGG" or "Ugg" followed by "boot": one in a Santa Cruz newspaper (December 1972),[14] and one in *Surfer* magazine (November and December 1979). *Id*. ¶ 47.[15]

Another surf-shop owner, Glen Kennedy, first became familiar with sheepskin boots on a trip to Australia in 1973—though he did not know if anyone referred to them as ugg boots. *Id*. ¶ 70. In the early 1980s, Kennedy began selling them in his California shop—selling around 80 pairs per year by 1986. *Id*. ¶ 71. After 1986, Kennedy bought sheepskin boots from Smith, and sold them under the UGG brand. *Id*. ¶ 72. Kennedy had to explain to customers what the boots were for; only the few customers who had traveled to Australia were familiar with them. *Id*. Four other individuals, who worked in different capacities in the footwear industry, ranging from

---

[14] Deckers raises foundation and hearsay objections to the Santa Cruz newspaper. *See* [214] ¶ 57. But Deckers asserts, and Australian Leather agrees, that this issue of the newspaper referenced "UGG BOOTS." [189] ¶ 47.

[15] In addition to the Santa Cruz newspaper, [184-3], Australian Leather also relies on an Australian phonebook which uses ugg generically, [184-7]; an article which purports to quote Smith, [184-8]; and a copy of UGG's webpage, [184-25]. But this evidence was not properly authenticated, and I do not consider it. *See* Fed. R. Evid. 901.

sales clerks to the former CEO of Deckers, consistently surveyed the market and believed that UGG had always been a brand name. *Id.* ¶¶ 73–77.

In 1971, Shane Stedman registered UGH-BOOTS as a trademark in Australia for boots, shoes, and slippers, and in 1982 he registered the mark UGH for boots, including sheepskin boots, shoes, and slippers. *Id.* ¶ 79. A one-time professional surfer from Southern California met Stedman in Australia and ordered a hundred pairs of the boots from him but was unable to sell them in the U.S. *Id.* ¶¶ 68–69. Deckers purchased the UGH-BOOTS trademark in 1996, and both marks remained on the Australian register until 2006 when they were removed for non-use. *Id.* ¶ 79.

Defendant Australian Leather, an Australian corporation founded in the 1990s, also manufactured sheepskin boots and labeled them "UGG" boots. [189] ¶ 2, 112; [204] ¶ 23. Adnan Oygur was its sole owner and managing director. [189] ¶ 2. Australian Leather did not market to the U.S., though it made sales to American consumers over the internet. *Id.* ¶ 112. Australian Leather first sold footwear bearing the UGG mark to the U.S. on October 27, 2014. *Id.* Its invoices reflected 33 internet orders for 42 products from American individuals between 2014–16. *Id.* In addition to individual sales, American retailers contacted Oygur to inquire about wholesale purchasing opportunities. *Id.* ¶ 115.

### 3. *Consumer Perceptions*

The predominant customers of UGG boots were women between the ages 16 to 54. *Id.* ¶ 20. In 2017, Deckers commissioned a nationwide survey of 600 women in this age range who had purchased a pair of boots or casual shoes (not including

athletic shoes) in the past 12 months or who thought they would in the next 12 months. *Id.* ¶¶ 33–34. The survey included three brand-name controls and three generic-name controls, and revealed that 98% of respondents viewed UGG as a brand name:

| Understanding of Various Shoe Names, Among All Survey Respondents | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **UGG** | TOMS | ROCKPORT | ECCO | SLIDE | CLOG | FLATS |
| | *(n = 600)* | *(n = 600)* | *(n = 600)* | *(n = 600)* | *(n = 600)* | *(n = 600)* | *(n = 600)* |
| Brand name | 98% | 91% | 74% | 71% | 2% | 4% | <1% |
| Common name | 1 | 2 | 2 | 3 | 76 | 94 | 99 |
| Other | 0 | 0 | <1 | <1 | <1 | <1 | 0 |
| Haven't heard of it/ don't know | 1 | 7 | 23 | 26 | 21 | 2 | 0 |

*Id.* ¶ 33. In addition to the 2017 survey, Deckers commissioned similar surveys in 2004 and 2011. *Id.* ¶ 34. In 2004, 58% of all respondents understood UGG to be a brand name and in 2011, 89% of respondents did. *Id.*

A linguistics professor searched dictionaries and databases—including the Corpus of Contemporary American English, Google Books, Lexis-Nexis Academic, and the Newspaper Archive—for two relevant time periods (1970–80 and 2009–15) for uses of the word ugg. *Id.* ¶¶ 36–40. None of the sources she looked at revealed that ugg, ug, or ugh was used generically in the footwear context. *Id.*[16] Another linguist replicated some of these searches and similarly found no results referring to footwear.

---

[16] Australian Leather objects to the professor's methodology, pointing out that one of the databases did not have entries for the 1970–79 timeframe and she did not know offhand the amount of material some of the databases contained for the given timeframes. *See* [189] ¶ 40. These objections implicate the weight of the evidence and do not refute the underlying asserted fact that those searches returned no relevant results.

*Id.* ¶ 41. A footwear historian was asked: from 1969–84, "what terminology was used in the United States by the footwear trade and American public for footwear made in whole or in part of sheepskin," and "what was the primary significance of the term 'UGG' in the American footwear trade and among the American public?" *Id.* ¶ 43. After conducting his own research and considering the catalogs and materials provided to him, this historian concluded that neither the word ugg, nor any variation of that spelling, was used "as a generic term by the general consuming public or the footwear trade in the U.S." *Id.* The historian testified it was possible that a "tiny little group of surfers in Southern California" knew about the term ugg apart from the brand, but noted that "[t]his small group of surfers . . . doesn't talk about the entire country," which was the focus of his inquiry. [214] ¶ 67; [184-10] at 108:3–12. Prior to UGG-brand advertisements from 1979 and the early 1980s, he concluded, ugg had no significance in the footwear trade or among American consumers. [189] ¶ 43.

The *Complete Footwear Dictionary*, which identifies 110 types of boots and has been described as the "most widely used and authoritative general book on the subject of footwear," does not mention uggs. *Id.* ¶ 44. Other footwear companies and articles published in the U.S. in the 1970s used terms like sheepskin, lambskin, lambswool, shearling, and genuine shearling wool fleece, to describe similar boots. *Id.* ¶¶ 45–46. Deckers's competitors continued to use similar terms to describe their products into 2018. [204] ¶ 6.

Australian Leather relies on a declaration and exhibits submitted during an Australian Trade Marks Office proceeding called *Deckers Outdoor Corp. v. B&B*

*McDougall*. [136-2]. The exhibits attached to the declaration include Australian telephone books, advertisements, and dictionaries using the term ugg. But the declaration itself fails to comport with 28 U.S.C. § 1746(1) and is inadmissible hearsay. As a result, the exhibits are not properly authenticated, and I do not consider them. *See* Fed. R. Evid. 901. In any event, as discussed below, even assuming Australian Leather established that ugg was generic in Australia, in part by offering these phone books, ads, and dictionaries, it has not linked that finding in any way to consumer perceptions in the U.S. and so considering this evidence would not change the result here.

> 4. *Generic Status*

Australian Leather has not shown that ugg is, or ever has been, generic among footwear customers in the U.S—the relevant public. Australian Leather argues that the word ugg was generic among American surfers in the 1970s, but there is no reason to construe the relevant public so narrowly. Sheepskin boots are not a specialized technology that appeals only to some limited consumer base. *See Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 406 (6th Cir. 2002). Though many early customers were surfers, anyone can purchase and wear boots (as evidenced by the shift in UGG's consumer-base over time). To show that ugg is generic, Australian Leather relies on the statements from a handful of American surfers and surf-shop owners; testimony from Australian manufacturers who sold boots in the U.S. (including statements from Smith); and a few advertisements. It points to no additional evidence, surveys or otherwise, of consumer perceptions. Crediting this

evidence and drawing inferences in Australian Leather's favor demonstrates that some individuals used ugg generically in the past. But this is not enough to justify the conclusion that American footwear purchasers generally view ugg as a generic term. Based on Deckers's survey evidence and expert testimony—which revealed no generic uses of ugg in any dictionaries or databases and showed that 98% of consumers interviewed thought ugg was a brand—no reasonable factfinder could conclude that ugg is or ever was a generic word for sheepskin boots in the U.S.

Looking to the Australian experience does not alter this outcome. Although evidence of how Australians used the word ugg could be relevant to consumer perceptions in the U.S., generic usage in Australia is not enough on its own to infer generic meaning in the United States. *See G. Heileman Brewing*, 873 F.2d at 1000 n. 15. The foreign-equivalents doctrine does not dictate a different analysis. *See id.* (citing *Duncan F. Duncan, Inc. v. Royal Tops Mfg. Co., Inc.*, 343 F.2d 655, 661–62 (7th Cir. 1965), and noting that the generic status of "yo-yo" in the Philippines was not dispositive of trademark status in the United States). First, the doctrine is not a perfect fit for English to English, and is generally used to analyze non-English terms used in the American marketplace. 2 McCarthy on Trademarks and Unfair Competition § 12:41 (5th ed.) ("Under the doctrine of foreign equivalents, a word commonly used in *another language* as the generic name of a product cannot be imported into the United States and be transformed into a valid trademark. Generic names in languages *other than English* have often been held to be generic for the

American trade.") (emphasis added).[17] Second, as applied here, the doctrine is simply an expression of the prohibition on allowing a trademark to monopolize a generic term. Australian Leather has evidence that ugg is generic in Australia, but there is no evidence that Americans familiar with Australian usage (or Australian visitors to the United States) would be misled into thinking that there is only one brand of ugg-style sheepskin boots available in this country. Australian Leather needed to come forward with some evidence that would allow a jury to conclude that the term ugg has a generic meaning to buyers in the United States; its Australian and surf-shop evidence does not suffice.

Australian Leather, through expert testimony from an intellectual property professor at Monash University in Australia, also attempts to introduce evidence regarding the legal status of ugg in Australia. Australian Leather retained the professor to report on whether the word ugg (or minor variations of that term) is generic in Australia for sheepskin footwear. Deckers argues that the report is inadmissible because the legal status of ugg in Australia is irrelevant and that the professor's testimony is inadmissible under Rule 702 and *Daubert*. Deckers also notes that whether the term was generic in Australia in the past is outside of the scope of the report; the professor focused his analysis on the current legal status of the term. "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the

---

[17] *See UGG Holdings, Inc. v. Severn*, No. CV04-1137-JFW FMOX, 2005 WL 5887187, at *6 (C.D. Cal. Feb. 23, 2005).

Federal Rules of Evidence." Fed. R. Civ. P. 44.1. But the legal status of the term in Australia is irrelevant,[18] and the legal expert is not qualified to testify about consumer perceptions. As a result, I do not consider the report in deciding these motions.

Even assuming the term is generic in Australia, no reasonable jury could conclude that it is generic in the United States.

## B.    Fraud on the Patent and Trademark Office

Australian Leather argues that Deckers's predecessor fraudulently acquired its trademark in an UGG ram logo, asserting both a counterclaim seeking damages caused by that fraud and an affirmative defense.[19] *See* 15 U.S.C. §§ 1115(b)(1); 1120 ("Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation . . . shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof."). Fraud in procuring a trademark "occurs when an applicant knowingly makes false, material representations of fact in connection with an application." *Metro Traffic Control, Inc. v. Shadow Network, Inc.*, 104 F.3d 336, 340 (Fed. Cir. 1997). A plaintiff alleging that a trademark was obtained though fraudulent means must demonstrate fraud with clear and convincing evidence. *Money Store v.*

---

[18] For this reason, I also disregard asserted facts about trademark law in Australia generally and about the legal status of the word ugg in Australia. [173] ¶¶ 18, 20–28; [204] ¶¶ 3–4, 9–12. *See also* footnote 2 above.

[19] In its response to Deckers's motion for summary judgment, Australian Leather waived any fraud claims in connection with all trademark applications aside from the '992 application. [181] at 27.

*Harriscorp Finance, Inc.*, 689 F.2d 666, 670 (7th Cir. 1982). A mistake in an application is insufficient. *Id*. at 678. Heightened burdens of proof, such as the clear-and-convincing-evidence standard, should be considered at the summary-judgment stage. *Anderson*, 477 U.S. at 255.

In December 1985, UGG Imports applied to register the following logo with the U.S. Patent and Trademark Office:



[189] ¶ 88. In the application, Smith declared that he believed the corporation to be the owner of the mark and that no other person had the right to use the mark. *Id*. He initially listed the date of first use as December 28, 1979, but later amended that date to June 1983. *Id*. ¶ 89.[20] Carl Brown, the attorney for UGG Imports who prosecuted the trademark, spoke with a Trademark Examining Attorney regarding the application. *Id*. ¶ 91. Jody Drake, a former trademark examining attorney testified that an examiner would be required to ask the applicant "[d]oes the term 'UGG' have any meaning in a relevant trade or industry." [184-17] at 84:1–25. Drake concluded that because the examining attorney reviewing UGG's application wrote "[t]here is no significance," Brown must have answered that there was no meaning in the

---

[20] Australian Leather notes that Deckers amended the first-use date after resolving a trademark lawsuit and argues Smith lied to gain an advantage in that litigation. For reasons discussed below, whether Smith lied in this application is irrelevant.

relevant industry. *Id.* Brown testified that during that conversation, the examining attorney asked him whether ugg "had any meaning in the sheepskin business as a grade or the like." *Id.* ¶ 91; [154-16] at 13:19–24. According to Brown, he replied that he didn't think so in the U.S., but that he thought ugg was used to identify sheepskin boots in Australia. [189] ¶ 91; [154-16] at 13:25–14:3. The UGG ram logo trademark registered in 1987 as U.S. Trademark Registration No. 1,460,992. [189] ¶ 90; [173] ¶ 30. Deckers did not renew the '992 registration, and it expired in 2008. [189] ¶ 90.

Australian Leather alleges that both Smith and Brown made material misrepresentations in this application. Australian Leather asserts that Smith purposefully gave the wrong first-use date to gain an advantage in a separate lawsuit and lied when saying his company had the exclusive right to the mark when he knew the word ugg was generic. Brown lied to the examining attorney, Australian Leather asserts, when saying ugg had no significance in the relevant industry.[21] But because the '992 trademark expired in 2008—six years before Australian Leather's entry into the U.S. market—Australian Leather has failed to establish that it sustained any damages from Deckers's alleged fraud. *See* 15 U.S.C. § 1120.

Australian Leather argues that had Brown (both parties focus on Brown's statements) told the truth in the application, and disclosed that ugg was a generic term in Australia, the examining attorney would have placed a disclaimer on the

---

[21] As evidence that Brown made this statement knowing it was false, Australian Leather points to a supposedly contradictory statement Brown made in a deposition for the *Severn* lawsuit and to Drake's expert testimony that Brown must have told the examining attorney there was no relevant meaning to the term in the industry to have the trademark issued without a disclaimer attached to the word UGG.

word UGG in the mark, which would have signaled the mark's generic status in future applications and prevented UGG from obtaining a trademark in the word itself. Australian Leather's theory is inconsistent with the law. Even assuming that with full disclosure, the examining attorney would have attached a disclaimer to UGG in the ram logo, it does not follow that the word ugg *is* generic. And because it is not generic to the relevant consumers in the U.S., Deckers may rightfully own its subsequent trademarks. Australian Leather cannot attribute any harm it has suffered from Deckers's ownership rights to the '992 trademark as opposed to any other. And even if all Deckers's trademark registrations were subject to cancellation based on fraudulent procurement, it would still have its common-law ownership rights. *See Specialized Seating, Inc. v. Greenwich Industries*, 616 F.3d 722, 728 (7th Cir. 2010) (holding that cancellation of a trademark's registration does not "affect the mark's *validity*, because a trademark need not be registered to be enforceable"). Any damages Australian Leather suffered from Deckers's trademarks cannot be attributed to any fraud associated with the '992 trademark, and without damages, Australian Leather's counterclaim fails.

Deckers does not allege that Australian Leather violated the '992 trademark (nor could it, since the mark has expired), so the alleged fraud would not be an affirmative defense to the claims in this case. *See* 15 U.S.C. § 1115(b)(1) (providing that a plaintiff's right to use a registered mark is subject to the defense that "*the* registration or the incontestable right to use *the* mark was obtained fraudulently."

(emphasis added)). Any fraudulent procurement of the '992 mark had no impact on Australian Leather, and so it cannot recover for that fraud or use it as a defense.

## C.    False Designation of Origin

Australian Leather alleges that Deckers falsely represents that its boots are made in Australia in violation of the Lanham Act, the Illinois Uniform Deceptive Practices Act, and the Illinois Consumer Fraud Act. To prevail on a claim under any of these theories, a plaintiff must show that the defendant made a deceptive or misleading statement. 15 U.S.C. § 1125; 815 ILCS 510/2; 815 ILCS 505/2.

From 1979–85, UGG Imports manufactured all its footwear in Australia. [189] ¶ 99. It began sourcing some footwear through a New Zealand factory in the late 1980s, though most UGG footwear sold through 1995 was made in Australia. *Id*. As the brand grew, UGG moved its manufacturing to China, Vietnam, and elsewhere, though it continued to source most of its sheepskin from Australia. *Id*. While Deckers has continually marketed its footwear reflecting the brand's Australian heritage, it also expanded its product line to include non-heritage products, and in 2015, Deckers rebranded from UGG Australia to UGG. *Id*. ¶ 21.

Australian Leather argues that it is deceptive to use the slogan UGG Australia when the boots are not manufactured in Australia, but Deckers accurately labels the inside of each pair of boots with the country of manufacture. *Id*. ¶ 98. And at least in recent years, Deckers has displayed country of origin labeling on all footwear boxes and on its website. *Id*. When determining whether a statement is deceptive or misleading, a court considers the statement in context, viewing the product as a

whole. *See Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 250–51 (3rd Cir. 2011). The UGG Australia label does not state that the boots were made in Australia. And because every pair of boots with that label also contains a more specific country of origin label, no reasonable juror could conclude that Deckers deceptively marketed its boots as being made in Australia.

### D.     False Statements on Ugg's Website

Australian Leather also alleges that Deckers made false or misleading statements about Australian Leather on the UGG website in violation of the Lanham Act, 15 U.S.C. § 1125. On its website, Deckers educated other retailers and consumers about its rights in the UGG brand and trademark and maintained an anti-counterfeiting education page. [189] ¶ 32. The website also contained a search function which allowed consumers to look-up online retailers to see if they were authorized dealers of UGG-brand products. *Id.* ¶ 107. If the tool did not recognize the searched term as an authorized dealer, it generated the message: "[the searched term] isn't known to our database and cannot be verified as an authorized retailer. This may be a site that deals in counterfeit products." *Id.* Deckers maintained another webpage titled "UGG® is a Brand," which contained information about the UGH trademark in Australia and stated that "[s]ome Australian companies . . . otherwise circulate misinformation regarding the UGG mark." *See* [214] ¶ 83. None of Deckers's counterfeit-education webpages mentioned Australian Leather. [189] ¶ 105.

Australian Leather argues that the search function results misrepresent that it deals in counterfeit products. But when a customer types "Australian Leather" into

the site, the tracker generates the same form message that it would for any unrecognized term. Australian Leather also asserts that the information explaining the dangers of counterfeit goods misleads consumers by improperly linking Australian Leather to those dangers. But Deckers never mentions Australian Leather by name, and there is no reason that a consumer would conclude that those statements were about Australian Leather. Further, for the reasons discussed, it is not false or misleading for Deckers to say that the word ugg is not generic in the U.S. Because the statements Australian Leather points to were not false, and because they do not mention Australian Leather, Australian Leather cannot prevail on its fraud claims.

## E.    Unclean Hands

Australian Leather asserts that Deckers should be barred by the doctrine of unclean hands from enforcing its trademarks based on its predecessor's abuse of the ® symbol. Deckers owns eleven U.S. trademark registrations that contain the UGG mark. [189] ¶ 94. In May 1996, UGG (at that point UGG Holdings) received a U.S. Trademark Registration for the text word UGG for footwear and other goods. [173] ¶ 31. Though it did not own a trademark in the word UGG before 1996, *id.* ¶ 32; [136-1] ¶¶ 123–26, Smith and his companies used the ® symbol next to the word UGG in various advertisements and documents. [173] ¶¶ 33–48.[22] Smith considered his trademark to be for UGG and thought he was legally required to use the ® symbol

---

[22] Deckers raises objections about some of these examples, disputing whether the purported publication date is accurate. It does not deny, however, that it used the ® symbol before 1996. *See* [173] ¶¶ 33, 36, 39, 41–47.

next to it. [204] ¶ 26. To Smith's knowledge, none of his companies received a complaint about improper use of the ® symbol. *Id.* ¶ 27. Based on this testimony, Deckers disputes that the alleged misconduct was willful.

Australian Leather uses the ® symbol next to its name as well, and it has never applied for a trademark registration. [204] ¶¶ 28–29. Deckers argues that Australian Leather's own misuse precludes it from relying on the unclean-hands doctrine. *See Leo Feist, Inc. v. Young*, 138 F.2d 972, 975 (7th Cir. 1943) (discussing the doctrine of unclean hands and noting that "if the defendant has been guilty of conduct more unconscionable and unworthy than that of the plaintiff, the rule may be relaxed"). Because there are genuine disputes of material facts as to the requisite intent and the degree of culpability of both parties, summary judgment is inappropriate.

### F.    Damages

Australian Leather estimates, relying on Oygur's calculations, that if Deckers did not own or enforce its trademarks, Australian Leather would have sold 75,000 pairs of boots (60,000 short boots and 15,000 long boots) annually to wholesalers in the United States from 2008–16. [189] ¶ 111; [154-11] at 78. He also estimates the wholesale prices for which Australian Leather could have sold those boots to American retailers. *Id.* Oygur bases these estimates on his own experiences; he did not do any test sales, studies, or surveys to determine the American demand for the product. [189] ¶ 113. While the accuracy and precision of Oygur's calculations may be questioned, they are based on his personal knowledge of the industry and not so speculative as to entitle Deckers to summary judgment on the issue.

### III. Conclusion

Deckers's motion for partial summary judgment is granted with respect to Australian Leather's claims based on fraud, generic status, and the foreign equivalents doctrine. The motion as to Australian Leather's damages calculation is denied. Australian Leather's motion is denied. Deckers's motion for summary judgment, [137], is granted in part, denied in part. Australian Leather's motion, [130], is denied.

ENTER:

Manish S. Shah
United States District Judge

Date: September 13, 2018