# EXHIBIT 1

# REPORT TO CONGRESS

**Trademark Litigation Tactics**
*and*
**Federal Government Services to Protect Trademarks and Prevent
Counterfeiting**

**April 2011**

**S. 2968, Trademark Technical and Conforming Amendment Act of 2010**
**Public Law 111-146**

### SEC. 4. STUDY AND REPORT.

(a) IN GENERAL.—Not later than 1 year after the date of enactment of this Act, the Secretary of Commerce, in consultation with the Intellectual Property Enforcement Coordinator, shall study and report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives on— (1) the extent to which small businesses may be harmed by litigation tactics ~~by corporations attempting~~ ***the purpose of which is***\* to enforce trademark rights beyond a reasonable interpretation of the scope of the rights granted to the trademark owner; and (2) the best use of Federal Government services to protect trademarks and prevent counterfeiting.

(b) RECOMMENDATIONS.—The study and report required under paragraph (1) shall also include any policy recommendations the Secretary of Commerce and the Intellectual Property Enforcement Coordinator deem appropriate.

---

\* The language shown in bold italicized text was amended by S. 3689, "Copyright Cleanup, Clarification and Corrections Act of 2010" which was signed into law on December 9, 2010 as Public Law 111-295. Section 6(h) states: "TRADEMARK TECHNICAL AMENDMENTS ACT.—Section 4(a)(1) of Public Law 111–146 is amended by striking ''by corporations attempting'' and inserting ''the purpose of which is.''

## TABLE OF CONTENTS

LETTER TO CONGRESS ..................................................................................................... i

I.    INTRODUCTION ..................................................................................................... 3

II.   TRADEMARK ENFORCEMENT AND MARKETPLACE IMPACT ............................................ 4

      A.    BACKGROUND ON TRADEMARK RIGHTS ................................................... 4

            1.    TRADEMARKS AND THEIR PURPOSE ............................................. 4

            2.    ALL TRADEMARKS ARE NOT CREATED EQUAL ............................. 5

      B.    POLICING AND ENFORCING TRADEMARK RIGHTS ....................................... 6

            1.    DETECTING POTENTIAL VIOLATIONS .......................................... 7

            2.    EVALUATING POTENTIAL VIOLATIONS ........................................ 7

            3.    ADDITIONAL ENFORCEMENT CONSIDERATIONS ........................... 9

            4.    TYPICAL ENFORCEMENT MEASURES ............................................ 9

                  A.    CEASE-AND-DESIST LETTERS ............................................. 9

                  B.    SETTLEMENT/LICENSE AGREEMENTS ................................ 10

                  C.    LITIGATION .................................................................... 11

                        (I)    AVAILABLE REMEDIES AND DETERRENTS TO COERCIVE BEHAVIOR ................. 12

      C.    MARKETPLACE IMPACT ............................................................................ 13

            1.    EVALUATING THE REASONABLENESS OF ENFORCEMENT EFFORTS: COERCIVE BEHAVIOR VS. DEFENSE OF A RIGHT ........................................................... 13

            2.    EXAMINING THE SCOPE OF THE ASSERTED PROBLEM ................ 15

            3.    SOLICITING PUBLIC COMMENT .................................................. 15

                  A.    QUESTIONS POSED ......................................................... 16

                  B.    COMMENTS RECEIVED .................................................... 18

                        (I)    CEASE-AND-DESIST LETTERS AND PRE-LITIGATION ISSUES ............... 18

                        (II)   ACTUAL LITIGATION ISSUES .................................. 19

                        (III)  HOW TACTICS IN IP CASES COMPARE TO OTHER TYPES OF CASES ................ 19

                        (IV)   SIZE AND RESOURCE IMBALANCES ......................... 20

                        (V)    SUGGESTIONS FOR USPTO OR TTAB ACTIONS .................. 20

                        (VI)   SUGGESTIONS FOR THE COURTS ............................. 21

                        (VII)  SUGGESTIONS FOR OTHER FEDERAL AGENCIES, NON-FEDERAL ORGANIZATIONS, AND CONGRESS ................................................. 21

III.  FEDERAL GOVERNMENT RESOURCES TO PROTECT INTELLECTUAL PROPERTY AND PREVENT COUNTERFEITING ........................................................................................................ 22

A.   DEPARTMENT OF COMMERCE'S INTERNATIONAL TRADE ADMINISTRATION'S OFFICE OF INTELLECTUAL PROPERTY (OIPR) ............................................................ 23

B.   UNITED STATES PATENT AND TRADEMARK OFFICE ........................................ 23

C.   DEPARTMENT OF COMMERCE'S COMMERCECONNECT .................................... 24

D.   U.S. SMALL BUSINESS ADMINISTRATION ..................................................... 24

E.   U.S. INTERNATIONAL TRADE COMMISSION ................................................... 25

F.   NATIONAL INTELLECTUAL PROPERTY RIGHTS COORDINATION CENTER ...................... 25

IV.  RECOMMENDATIONS ............................................................................................ 26

A.   INTELLECTUAL PROPERTY RIGHTS COUNSELING FOR SMALL BUSINESSES.................. 26

B.   ENGAGE THE PRIVATE SECTOR ABOUT OFFERING CONTINUING LEGAL EDUCATION PROGRAMS FOCUSED ON TRADEMARK POLICING MEASURES AND TACTICS ................ 27

C.   EDUCATE SMALL BUSINESSES ABOUT INTELLECTUAL PROPERTY RIGHTS AND AVAILABLE PROTECTION AND ENFORCEMENT RESOURCES ........................................... 28

APPENDIX A:  USG RESOURCE CONTACT INFORMATION SHEET                          A

APPENDIX B:  ACRONYMS ........................................................................................ B

## LETTER TO CONGRESS

The Department of Commerce is pleased to transmit this report on Trademark Litigation Tactics.

On March 17, 2010, President Obama signed S. 2968, Trademark Technical and Conforming Amendment Act of 2010, into law as Public Law 111-146. The new law tasked the Department of Commerce, in consultation with the Intellectual Property Enforcement Coordinator (IPEC), to study the extent to which small businesses may be harmed by abusive trademark enforcement tactics. Working with the IPEC, we developed the enclosed report and recommendations.

In introducing the study, Vermont Senator Patrick Leahy said:

> "I am concerned that large corporations are at times abusing the substantial rights Congress has granted them in their intellectual property to the detriment of small businesses. We saw a high-profile case like this in Vermont last year involving a spurious claim against Rock Art Brewery. When a corporation exaggerates the scope of its rights far beyond a reasonable interpretation in an attempt to bully a small business out of the market that is wrong."

Trademarks add tremendous value to the U.S. economy. Nine of the top ten global brands in the world hail from the United States.[1] Recognizing that a trademark is a property right that an owner has a duty to police, this report discusses trademark litigation tactics generally and the specific issue of whether, in otherwise rightfully policing marks, some trademark owners may undertake enforcement measures based on an unreasonable interpretation of the scope of their rights for the purpose of intimidating potential violators into compliance with the mark owner's demands.

In connection with studying this specific issue, the Department of Commerce's United States Patent and Trademark Office (USPTO) undertook significant outreach to stakeholders and small businesses, including a request for comments period that spanned more than four months. The 79 comments received reflected a diverse range of views, yet few explicitly addressed whether and to what extent trademark abuse is a significant problem.

Ultimately, because trademark enforcement is a private property rights litigation issue, if abusive tactics are a problem, such tactics may best be addressed by the existing safeguards in the litigation system in the U.S. and by private sector outreach, support, and education relating to these issues. However, to the extent small businesses are disproportionately adversely affected by such tactics because they lack the funds to hire counsel to defend against them, we believe the Federal Government can undertake the following actions:

1. Engage the private sector about providing free or low-cost legal advice to small businesses via *pro bono* programs and intellectual property rights clinics;

2. Engage the private sector about offering continuing legal education programs focused on trademark policing measures and tactics;

---

[1] Interbrand, Best Global Brands 2010, (http://www.interbrand.com/en/best-global-brands/Best-Global-Brands-2010.aspx).

3.  Enhance Federal agency educational outreach programs by identifying resources that enable small businesses to further their understanding of trademark rights, enforcement measures, and available resources for protecting and enforcing trademarks.

We look forward to continuing to work with Congress, Federal agencies, and all stakeholders, including small businesses, to improve the protection and enforcement of trademarks and other intellectual property.

Sincerely,


Gary Locke
Secretary of Commerce

## I.      Introduction

On March 17, 2010, President Obama signed S. 2968, Trademark Technical and Conforming Amendment Act of 2010, into law as Public Law 111-146. Included in the new law was the requirement for a study and report, due one year later, on the effect of abusive trademark litigation tactics on small businesses. The study and report was to be completed by the Department of Commerce (DOC), in consultation with the Intellectual Property Enforcement Coordinator (IPEC).

> **SEC. 4. STUDY AND REPORT.**
> (a) IN GENERAL.—Not later than 1 year after the date of enactment of this Act, the Secretary of Commerce, in consultation with the Intellectual Property Enforcement Coordinator, shall study and report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives on— (1) the extent to which small businesses may be harmed by litigation tactics by corporations attempting ***the purpose of which is[2]*** to enforce trademark rights beyond a reasonable interpretation of the scope of the rights granted to the trademark owner; and (2) the best use of Federal Government services to protect trademarks and prevent counterfeiting.
> (b) RECOMMENDATIONS.—The study and report required under paragraph (1) shall also include any policy recommendations the Secretary of Commerce and the Intellectual Property Enforcement Coordinator deem appropriate.

To address the study and report objectives, the DOC and the United States Patent and Trademark Office (USPTO) reviewed data and research materials regarding trademark litigation tactics, including tactics that may impact small businesses. In addition, USPTO requested feedback from U.S. trademark owners, practitioners, and others regarding their experiences with enforcement tactics, especially those involving an attempt to enforce trademark rights beyond a reasonable interpretation of the scope of the rights granted to the trademark owner. The USPTO conducted outreach to small businesses via an intellectual property awareness campaign event, and also conducted outreach to industry via a large industry organization. Finally, USPTO consulted with its own private advisory board, the Trademark Public Advisory Committee.

Because evaluating whether trademark rights have been enforced beyond a reasonable scope requires an understanding of fundamental trademark law principles and enforcement strategies, this report begins by providing basic background information about trademark rights and the typical ways in which, and reasons why, those rights are enforced in the United States. Against this background, the report next addresses trademark enforcement tactics and in doing so summarizes comments received from U.S. trademark owners, practitioners, and others in response to questions posted on USPTO's web site[3] requesting feedback regarding their experiences with litigation tactics, especially those involving an attempt to enforce trademark

---

2 The language shown in bold italicized text was amended by S. 3689, "Copyright Cleanup, Clarification and Corrections Act of 2010" which was signed into law on December 9, 2010 as Public Law No. 111-295. Section 6(h) states: "TRADEMARK TECHNICAL AMENDMENTS ACT.—Section 4(a)(1) of Public Law 111–146 is amended by striking ''by corporations attempting'' and inserting ''the purpose of which is.''

3 http://www.uspto.gov/trademarks/notices/litigation_tactics.jsp

rights beyond a reasonable interpretation of the scope of the trademark owner's rights. The topic of abusive trademark litigation tactics was also discussed at a public roundtable. Finally, the report provides an overview of the various Federal Government resources available to stakeholders to protect and enforce trademarks in the United States and the types of services the Government provides to help prevent counterfeiting in the United States.

## II.     Trademark Enforcement and Marketplace Impact[4]

Any discussion of trademark litigation tactics, and a study of their impact on small businesses, must begin with understanding what a trademark is, the scope of the right, and how the right is defended. Also, an examination of trademark litigation tactics must be made in the context of all litigation tactics, to determine if trademark litigation presents any unique or unusual issues.

### A.     Background on Trademark Rights

#### 1.     Trademarks and Their Purpose

The term "trademark"[5] is defined broadly as including: "any word, name, symbol, or device, or any combination thereof—(1) used by a person…to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."[6] In essence, a trademark is anything that functions as a source identifier to consumers.

Trademarks serve as indications of origin and quality. They represent the "goodwill" or reputation a business and its products and services enjoy with the public. Businesses rely on their marks to identify their products and services and distinguish them from those of their competitors. The public relies on marks to distinguish among competing producers and as guarantees of quality. As the Seventh Circuit has explained:

> The fundamental purpose of a trademark is to reduce consumer search costs by providing a concise and unequivocal identifier of the particular source of particular goods. The consumer who knows at a glance whose brand he is being asked to buy knows whom to hold responsible if the brand disappoints and whose product to buy in the future if the brand pleases. This in turn gives producers an incentive to maintain high and uniform quality, since otherwise the investment in their trademark may be lost as customers turn away in disappointment from the brand. A successful brand, however, creates an incentive in unsuccessful competitors to pass off their inferior brand as the successful brand by adopting a confusingly similar trademark, in effect appropriating the goodwill

---

[4] This section provides a general overview of basic trademark law principles. It is not intended to constitute legal advice. Interested parties should consult qualified legal counsel to obtain advice on a case-by-case basis.

[5] The terms "trademark" or "mark" as used in this report refer generally to both trademarks and service marks. A trademark identifies the source of goods, while a service mark identifies the source of services. *See* 15 U.S.C. § 1127.

[6] 15 U.S.C. § 1127.

created by the producer of the successful brand. The traditional and still central concern of trademark law is to provide remedies against this practice.[7]

Indeed, when Congress enacted the Lanham Act in 1946, 15 U.S.C. § 1051 *et seq.* ("Trademark Act"), it explained that the statute served dual purposes:

> One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.[8]

Thus, the Trademark Act protects against use of marks that are likely to cause confusion, mistake, or to deceive consumers as to the source, sponsorship, or approval of goods or services.[9] It also protects owners of famous marks against dilution through blurring or a tarnishing of their image even absent a likelihood of confusion.[10]

### 2. All Trademarks Are Not Created Equal

Trademarks are categorized along a spectrum of distinctiveness. On the one end are generic terms for the category of goods or services that can never be protected as trademarks. On the other end are fanciful or coined terms that are inherently the strongest kind of mark and generally afforded the broadest scope of protection.[11] Placement on the distinctiveness spectrum determines eligibility for and affects the scope of trademark protection.[12] Marks that are categorized on the inherently distinctive side of the spectrum -- fanciful/coined, arbitrary, suggestive -- are immediately protectable, while those falling into the merely descriptive category are non-distinctive and unprotectable unless they acquire secondary meaning.

In general, the more distinctive a mark is, the stronger it is and the greater the scope of protection the mark will receive in court against uses of the same or similar marks. Because all trademarks do not receive or deserve the same scope of protection, the type of mark a business selects will have a direct effect on its ability to protect the mark.

Trademark rights are not static, however. A mark's distinctiveness and strength can change over time based on use of the mark by the owner and the perception of the mark by consumers. For

---

[7] *Ty Inc. v. Perryman*, 306 F. 3d 509, 510 (7th Cir. 2002); *see also* 1 Anne Gilson LaLonde, GILSON ON TRADEMARKS ("Gilson") § 1.03 (2010).

[8] Senate Rep. No. 79-1333 at 3, 5 (1946).

[9] 15 U.S.C. §§ 1114, 1125(a).

[10] 15 U.S.C. § 1125(c).

[11] *See Abercrombie & Fitch Co. v. Hunting World, Inc.*. 537 F.2d 4, 9 (2d Cir. 1976) (setting forth the classic formulation of: fanciful/coined – arbitrary – suggestive – descriptive - generic).

[12] *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979) ("The strength or distinctiveness of a mark determines both the ease with which it may be established as a valid trademark and the degree of protection it will be afforded").

example, an inherently "weak" mark can become strong and receive a broader scope of protection due to commercial success and widespread use in commerce (e.g., increased channels of trade, wider geographic use, expansion of the brand to other goods and services).[13]  Conversely, if a trademark owner does not diligently police proper use of its mark (e.g., by competitors, the public, and the media), a term that was originally coined and thus inherently the strongest type of trademark, can become generic and fall into the public domain.  The trademark landscape is littered with distinctive terms that were once registered as trademarks, but became generic, including "cellophane"[14] for a transparent wrapping, "escalator"[15] for moveable staircases, "trampoline"[16] for a rebound tumbler, and "yo-yo"[17] for a spinning toy on a string.  Because trademarks rights may be lost or severely weakened if unauthorized third-party usage goes unchecked, enforcement efforts are essential to maintaining the rights.

###    B.    Policing and Enforcing Trademark Rights

Trademark owners have a legal right and an affirmative obligation to protect their trademark assets from misuse.[18]  If the owner does not proactively police the relevant market and enforce its rights against violators, the strength of the mark, the owner's ability to exclude others from using the same or similar marks in the marketplace, and the value of the asset all will diminish.[19]  Failure to take action may result in consumers being confused or deceived as to the source or sponsorship of goods or services, harm to the owner's reputation, and lost sales.  A trademark owner is not required to object to all unauthorized uses that might conflict, for not every third-party use poses the same risk of eroding distinctiveness in the marketplace.[20]  However, widespread unauthorized uses may cause the mark to lose its trademark significance altogether

---

[13] *See, e.g., E. Remy & Co., S.A. v. Shaw Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1533 (11th Cir. 1985).

[14] *DuPont Cellophane Co., Inc. v. Waxed Products Co., Inc.*, 85 F.2d 75 (2d. Cir. 1936).

[15] *Haughton Elevator Co. v. Seeberger*, 85 USPQ 80 (Comm. Pat. 1950).

[16] *Nissen Trampoline Co. v. American Trampoline Co.*, 193 F. Supp. 745 (S.D. Iowa 1961).

[17] *Donald F. Duncan, Inc. v. Royal Tops Mfg Co., Inc.*, 343 F.2d 655 (7th Cir. 1965).

[18] *See generally*, 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:91 (4th ed. 2010) ("McCarthy"); *see also* 1 McCarthy § 2:15 ("A trademark is a kind of property, but a very delicate property right it is.  Great care must be taken in the nature of its use, and in the manner in which it is assigned or licensed, lest the significance of the mark be lost.")

[19]  *See* 2 McCarthy § 11:91 ("The only way a trademark owner can prevent the market from becoming crowded with similar marks is to undertake an assertive program of policing adjacent "territory" and suing those who edge to close."); *see also Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 139 (2d Cir 1999) ("[T]he successful policing of a mark adds to its strength to the extent that it prevents weakening of the mark's distinctiveness in the relevant market.").

[20] As the USPTO's Trademark Trial and Appeal Board has observed: "[I]t is entirely reasonable for the [trademark owner] to object to the use of certain marks in use on some goods which it believes would conflict with the use of its marks . . . while not objecting to use of a similar mark on other goods which it does not believe would conflict with its own use."  *Chicago Bears Football Club Inc. v. 12th Man/Tennesse LLC*, 83 USPQ2d 1073, 1082 (TTAB 2007), quoting *McDonald's Corp. v. McKinley*, 13 USPQ2d 1895, 1899-1900 (TTAB 1989).

and fall into the public domain.[21]  Thus, diligent enforcement of trademark rights is necessary to help prevent others from unfairly trading off the mark owner's goodwill and reputation and to protect the public from mistakenly believing that the mark owner authorizes, endorses, sponsors, or is somehow affiliated with another business.

## 1.     Detecting Potential Violations

In view of the potential harms that failure to police rights violations can cause to the public and the trademark owner, mark owners must be proactive in monitoring registration activity at the USPTO and marketplace uses to discover potential trademark violations.  For example, trademark owners may search and monitor:

- newly filed trademark applications;
- published trademark applications;
- recently issued registrations;
- domain name registrations;
- the Internet, including Internet auction and news sites;
- new company names;
- competitors' marks and marketing materials; and
- other uses of trademarks in business.

Small businesses and startup companies that are still in the early phases of developing goodwill in their marks may not have many resources to devote to detecting infringements.  But they can still exercise vigilance by asking employees to keep an eye out for trademark violations and by periodically searching the Internet and USPTO's database of applications and registrations.

When resources permit, trademark owners or their counsel often will contract with a commercial trademark watch service provider to do much of the monitoring for them.  The trademark owner will set the parameters of the search in order to create an individualized watch strategy based on the owner's budget and trademark protection needs.  A very distinctive mark with wide use in commerce may benefit from a broad search for potentially conflicting marks, while a highly suggestive or descriptive mark may warrant only a limited search.  A typical set of weekly or monthly watch service reports might include several newly filed trademark applications in the United States, several foreign trademark applications that have been published for opposition, as well as a number of domain names that include marks or terms that may conflict with the trademark being protected by the watch service.

## 2.     Evaluating Potential Violations

Once unauthorized uses of the same or similar marks have been identified, the trademark owner typically consults trademark counsel to evaluate the matter and help determine whether action

---

[21] *See, e.g., Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 906, USPQ2d 1530  (9th Cir. 2007) (observing that "trademark owners are free (and perhaps wise) to take action to prevent their marks from becoming generic and entering the public domain--e.g., through a public relations campaign or active policing of the mark's use."); *BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565, 1570 (Fed. Cir. 1995) ("While the 'Walking Fingers' logo may once have been a strong candidate for trademark protection, through common usage by virtually all classified directory publishers it can no longer be understood to represent a source of the directories.  Instead . . . [it] now identifies the product — classified telephone directories — generally.); *see generally* 3 McCarthy §17:8.

should be taken, and if so, the best course of action to protect the owner's rights and further the owner's business goals. The first step in determining whether a particular use constitutes a potential rights violation is to consider the available legal theories and examine whether the elements of a claim (under Federal or state law) can be established.

The most common of these theories is trademark infringement. Trademark infringement is the commercial use of the same or similar mark by another that is "likely to cause confusion" among actual or potential customers of the products or services at issue. To prevail on a claim of infringement, the plaintiff must establish that it owns the mark, has priority of use over the defendant's use of the allegedly infringing mark, and that a likelihood of confusion as to source or sponsorship exists. In general, likelihood of confusion is evaluated on a case-by-case basis, considering the totality of circumstances.

Each circuit court of appeals has its own multi-factor test for evaluating likelihood of confusion necessary to ground a trademark infringement claim. While the articulation of the factors varies somewhat, all of the tests address the same basic types of factors.[22] These factors include the similarity of the marks, the similarity or relationship of the respective goods and/or services, the strength (inherent and marketplace) of the asserted mark, the commonality of trade channels and advertising methods, the sophistication of purchasers, whether the accused mark was adopted in bad faith, and the existence of actual confusion.

Although no one factor is necessarily controlling, two key factors are the similarity between the marks and the proximity of the goods and/or services. Average purchasers retain only a general, rather than specific, impression of trademarks. Thus, to qualify as "similar," marks need not be identical. Rather, the marks need only be sufficiently similar in the overall commercial impression they convey (e.g, they share sufficient similarities in one or more of the following factors: appearance, sound, or meaning). Likewise, the respective goods/services do not have to be identical or even competitive, and need only be related (e.g., they are of the same type, in the same field, used together, or marketed through the same channels of trade). Generally speaking, the *more* similar the marks, the *less* related the goods and/or services need to be to find a likelihood of confusion and the *less* similar the marks, the *more* related the goods and/or services need to be to find a likelihood of confusion.

Enforcement actions are not, however, limited to those uses that are likely to cause confusion. A reasonable interpretation of the scope of trademark rights also includes those uses that are likely to cause dilution[23] -- uses that are likely to tarnish[24] the reputation of or blur[25] the source-

---

[22] *See* 4 McCarthy §§ 24:30-24:43 (listing factors by circuit).

[23] *See* 15 U.S.C. § 1125(c) ("Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likelihood of confusion, of competition, or of actual economic injury.") To qualify for federal dilution protection, the mark owner must establish its mark is famous under the factors set out in the statute amongst the general consuming public of the United States. Many states also have laws that protect against dilution of marks.

[24] Compare *Kraft Food Holdings Inc. v. Helm*, 205 F. Supp.2d 946 (N.D. Ill. 2002) (injunction barring use of King Velveeda on adult web site as dilution by tarnishment of Velveeta cheese products) to *Starbucks Corp. v. Wolfe's Borough Coffee Inc.*, 588 F.3d 97 (2d Cir. 1009) (Charbucks line of high quality coffee not found to tarnish Starbucks, in fact, Charbucks may make Starbucks line more desireable).

identifying function of a mark that qualifies as "famous" by lessening the distinctiveness and selling power of the famous mark. It also includes those uses that constitute cybersquatting, or are otherwise an act of "unfair competition," such as false advertising.[26]

### 3. Additional Enforcement Considerations

Once a problematic mark has been identified, before taking enforcement measures, a prudent trademark owner typically conducts some due diligence and takes into account a number of considerations. For example, because prevailing on an infringement claim requires the mark owner to establish ownership and priority of use of its mark, mark owners often will investigate the third-party's use to determine whether the mark owner has superior rights, before taking action. Additional considerations may include the distinctiveness and strength of the mark being enforced, how similar the third-party mark is to the owner's mark, the nature of the third-party use (e.g., directly competitive or ancillary), the trademark owner's expansion plans for its mark, and the resources the owner has available for enforcement.

Additionally, the perceived level of risk presented by the third-party mark and the desired outcome of the enforcement effort typically affects both the approach and the tone of the enforcement effort. For example, in many cases a mark owner will be satisfied with an outcome where the violator ceases use of the challenged mark. In other cases, monetary relief will also be desired, particularly if intentional copying exists and the unauthorized user has profited from its infringing activities. In still other circumstances, the trademark owner may be willing to permit the unauthorized party to continue use, but subject to certain limitations, such as modifications to the challenged mark or the manner in which it is used, or geographically restricted use of the mark. Or the mark owner may only desire to keep the Federal register clear of similar marks. For example, where a third-party application or registration lists goods or services within the mark owner's scope of use, but the mark owner does not believe that the third-party's actual marketplace use is likely to cause confusion, the mark owner may not object to continued use of the third-party mark, but will object to its presence on the register.

### 4. Typical Enforcement Measures

Once the mark owner has committed to challenge a particular unauthorized mark, the course of action taken depends on the situation presented. The mark owner typically will first set forth its demands in a cease-and-desist letter, pursue settlement, and later may initiate a civil action.

### a. Cease-and-Desist Letters

Trademark enforcement efforts usually begin with sending a demand letter, also known as a "cease-and-desist letter." The cease-and-desist letter serves to put the alleged violator on notice of the mark owner's rights and the violator's perceived rights violation. The normal goal of such

---

[25] *See e.g.*, *Visa Intl. Serv. Assn. v. JSL Corp.*, (9th Cir. 2010) (dilution of the credit card company's mark by blurring was likely since Visa and eVisa – a mark used in connection with a multilingual educational and information service – were virtually identical, the common "e" prefix did not distinguish the marks, and two products would be competing for association with the word "Visa").

[26] *See* 15 U.S.C. § 1125(a)-(d).

a letter is to obtain early resolution of the matter and spare both parties the time and expense of a civil litigation or *inter partes* proceeding before USPTO's Trademark Trial and Appeal Board.

The typical format of a cease-and-desist letter notifies the alleged infringer of the mark owner's rights, explains why the mark owner believes confusion (or if appropriate, dilution) is occurring, or likely to occur if the alleged infringer continues use of its mark, and sets forth the mark owner's demands that the alleged infringer take certain actions (e.g., ceasing use, abandoning applications, surrendering domain names, obliterating the mark from existing products, limiting use to a certain manner and scope, paying profits, and the like). The letter also usually requests a response by a specified date or within a specific time frame.

The demands in the letter and the tone (threatening or conciliatory) may vary depending on the facts and circumstances presented. If a violation is sufficiently problematic that the mark owner is prepared to litigate immediately, the letter may threaten such litigation if the violator fails to comply with the demands set forth in the letter. The letter may even be accompanied by a courtesy copy of a complaint that has been or will be filed if the matter cannot be expeditiously resolved to the satisfaction of the mark owner.

Upon receiving a demand letter, the recipient may respond on its own or consult with trademark counsel. Often, counsel will send a "hold" letter to buy time to investigate the merits of the mark owner's claims, consult with the client, and prepare a response.

Responses to a cease-and-desist letter generally fall into three main categories:

1)      The alleged violator agrees to comply with the mark owner's demands and/or stops using the offending trademark. If this occurs, the parties may memorialize this in writing with either a written response letter that resolves the matter, or if the matter is more complex, via a settlement agreement.

2)      The alleged violator does not respond within the specified time frame. At this point, the mark owner often will send a follow-up letter. If no response is forthcoming, the mark owner will either decide to drop its effort and acquiesce in that party's use, or the mark owner will continue to pursue the matter by filing a lawsuit (typically in a Federal district court). If the owner's concern relates solely to efforts to register a mark, the owner may opt to file a proceeding with USPTO's TTAB to petition to cancel a registration or oppose an application, instead of filing a district court action.

3)      The alleged infringer denies the allegations of infringement and/or asserts various legal defenses justifying its ability to use its mark, files a declaratory judgment action, or offers a compromise solution for going forward. If the response presents compelling facts or legal points that the mark owner may not have known or failed to consider, the owner may decide to pursue settlement or drop its claims altogether (e.g., if it turns out the alleged infringer can show that it has priority of use). If the mark owner does not believe settlement is possible, the mark owner usually will continue to pursue the matter by filing a lawsuit or initiating a cancellation or opposition proceeding with USPTO's TTAB.

### b.      Settlement/License Agreements

If the trademark dispute can be resolved amicably, the parties may enter into a settlement agreement. If the parties believe their marks can co-exist, the agreement terms may include

provisions governing use and/or registration of the marks aimed at reducing the potential for confusion in the marketplace. For example, settlement agreements may include terms governing the manner and format in which the alleged infringer's mark may be used (e.g., a particular font or stylization, with a disclaimer, etc.), the products and services on which it may be used, and the geographic areas in which it may be used. In matters where the alleged infringer will cease use of the mark but requires time to transition to a new mark, the agreement typically will include terms addressing the length of time the alleged infringer has to phase out use of its mark.

In appropriate circumstances, a trademark owner may choose to grant a license for the use of its mark by the alleged infringer. When done properly, licensing can enhance trademark recognition and rights. Licensing can also be an effective way to end litigation or a cost-effective alternative to litigation.

Settlement and license agreements usually enable the mark owner to exercise some control over how and by whom its marks are used, thereby protecting the owner's trademark rights and even strengthening them.

### c. Litigation

If the alleged violator does not respond to a cease-and-desist letter or settlement talks are not successful, the mark owner may decide to file a lawsuit seeking to enjoin the unauthorized use. As noted earlier, the most common cause of action mark owners assert in civil actions is trademark infringement. The Trademark Act authorizes suit to be brought for infringement of either federally registered or common law trademark rights.[27] In addition to infringement, there are several other legal theories, such as dilution, that may be available to trademark owners under Federal and/or state law, depending on the particular facts presented. The mark owner may also assert state and/or common law infringement and unfair competition claims.

Alternatively, if the disputed mark is the subject of a Federal registration or pending application, the mark owner may choose to initiate, respectively, an *inter partes* cancellation or opposition proceeding at USPTO's Trademark Trial and Appeal Board instead of filing a civil litigation. The TTAB's jurisdiction is limited to determining the right to keep an existing registration or obtain a new registration based on a pending application.[28] Because of the limited focus on registration rights, the claims and defenses that can be asserted in TTAB proceedings necessarily are fewer in number than in Federal district courts. For example, claims alleging unfair competition based on the manner of one's use of a mark cannot be asserted in a TTAB proceeding, and the Board cannot be asked to enjoin another's use of a mark. Apart from the more limited scope of claims and defenses, trial of TTAB cases also is conducted differently than in the courts. TTAB trials never involve a jury and do not involve in-court presentation of witnesses and evidence. Rather, the trial is conducted primarily by mail and without direct supervision of the Board. The TTAB proceedings do not have all the "bells and whistles" of Federal court litigation, and are designed to be less complex and less expensive than full-blown civil litigation.

---

[27] 15 U.S.C. §§ 1114, 1125(a).

[28] *See* 15 U.S.C. §§ 1067, 1068.

(i)    **Available Remedies and Deterrents to Coercive Behavior**

The Trademark Act provides for a variety of remedies in a civil action.[29]  The most typical remedy is injunctive relief prohibiting use of the infringing mark.  Courts have considerable discretion in fashioning an appropriate injunction.  Along with an injunction, a court may order other non-monetary relief, including the destruction of infringing articles,[30] corrective advertising, and cancellation of Federal registrations.[31]

Monetary remedies may also be available, including an accounting of the infringer's profits, damages sustained by the plaintiff, and the costs of the action.[32]  Depending on the circumstances of the case, a court may award increased or trebled actual damages where infringement is willful, and attorneys' fees in exceptional cases.[33]  Where the infringement involves willful use of a "counterfeit" of a registered mark, statutory damages of up to U.S. $2,000,000 may be awarded and an award of attorneys' fees imposed, unless the infringer proves extenuating circumstances.[34]

Courts have broad discretion to award or withhold monetary relief according to the equities and circumstances of the case.[35]  Generally, the more aggravated the defendant's conduct, the more likely the court is to grant monetary relief.  For example, where the infringement is deliberate and defendant's use of the mark is intentionally misleading, or where substantial damage has been inflicted on the plaintiff, damages and an accounting are typically appropriate.

One particular remedy that appears to be targeted specifically at unreasonable trademark litigation behavior is the award of attorneys' fees.  In trademark cases, attorneys' fees are potentially available under the Trademark Act, but only in "exceptional cases."[36]  In general, "cases that award attorneys' fees under 15 U.S.C. § 1117(a) involve truly egregious, purposeful infringement, or other purposeful wrongdoing"[37] or behavior that goes "beyond the pale of acceptable conduct."[38]

In cases of trademark infringement, courts generally look to the legislative history, which indicates that "exceptional" means "where the acts of infringement can be characterized as

---

[29] 15 U.S.C. § 1117.  These remedies are not available in TTAB proceedings.

[30] 15 U.S.C. § 1118.

[31] 15 U.S.C. § 1119.

[32] 15 U.S.C. § 1117(a).

[33] *Id.*

[34] 15 U.S.C. § 1117(b), (c).

[35] 15 U.S.C. § 1117.

[36] 15 U.S.C. § 1117(a).

[37] *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1159 (7th Cir. 1994).

[38] *Aromatique Inc. v. Gold Seal Inc.*, 28 F.3d 863 (8th Cir. 1994).

'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'"[39]  In determining whether a defendant is entitled to an award of attorneys' fees, courts may consider the objective merits of plaintiff's claims and whether the suit was vexatious or brought to harass.[40]  Where a plaintiff legitimately tests the boundaries of the law and a court rejects the claim, this generally does not warrant an award of fees.

When Congress amended § 1117(a) of the Trademark Act in 1975 to provide for awards of attorneys' fees in exceptional cases, it recognized that trademark claims and resulting litigation tactics are subject to abuse by *either* party.  The legislative history of the 1975 amendment notes that attorneys' fees award were intended to protect and serve successful plaintiffs and also to permit prevailing defendants to recover attorney fees to "provide protection against unfounded suits brought by trademark owners for harassment and the like."[41]

Courts further recognize that parties big or small can take unfair advantage of the litigation process.  For example, the Seventh Circuit recently attempted to fashion a more balanced test for the award of attorneys' fees, concluding that:

> [A] case under the Lanham Act is 'exceptional,' in the sense of warranting an award of reasonable attorneys' fees to the winning party, if the losing party was the plaintiff and was guilty of abuse of process in suing, or if the losing party was the defendant and had no defense yet persisted in the trademark infringement or false advertising for which he was being sued, in order to impose costs on his opponent. [42]

Thus, the potential for an award of attorneys' fees is an existing deterrent to misuse of the litigation process in trademark disputes.

### C.     Marketplace Impact

#### 1.     Evaluating the Reasonableness of Enforcement Efforts:  Coercive Behavior vs. Defense of a Right

A trademark owner must walk a fine line between being too zealous in enforcing its rights and not being zealous enough.  The stronger a mark and the more goodwill that attaches to it, the more aggressive an owner is expected and entitled to be in asserting its rights against others.[43]

---

[39] H. R. Rep. No. 524, 93d Cong., 1st Sess. 2 (1973); S. Rep. No. 93-1400, 93d Cong., 2d Sess. 2 (1974).

[40] *See generally* 5 McCarthy §§ 30:98-30:101 (discussing situations meriting award of attorney fees).

[41] S. Rep. No. 93-1400, 93rd Cong., 2d Sess. (1974); *see also Mattel, Inc. v. Walking Mountain Productions*, 2004 WL 145100 (C.D. Cal. 2004) (in granting defendant costs and over $1.5 million in attorneys' fees, the court stated that:  "Plaintiff had access to sophisticated counsel who could have determined that such a suit was objectively unreasonable and frivolous.  Instead, it appears Plaintiff forced Defendant into costly litigation . . . .), on remand from 353 F.3d 792 (9th Cir. 2003) (noting that Mattel's claims against a photographer who used Barbie's image in his artwork "may have been groundless or unreasonable" thus warranting an award of attorneys' fees).

[42] *Nightingale Home Healthcare, Inc. v Anodyne Therapy, LLC*., 626 F.3d 958, 963-64 (7th Cir. 2010).

[43] *See, e.g., James Burrough, Ltd. v. Lesher*, 309 F. Supp. 1154, 1161 (S.D. Ind. 1969) (in an infringement action involving the BEEFEATER gin mark, the court explained:  "Any coercion involved, or monopolization effected, is no more than plaintiffs are entitled to exert and effect under the law.").

In view of the mark owner's obligation to police violations, aggressive enforcement of one's trademark rights does not automatically equate to abuse or bullying. In fact, as suggested by some of those who provided public comments, most trademark owners are not setting out to assert dubious claims or be bullies when they initiate enforcement measures. They are simply trying to protect the strength of their marks and their reputation, and avoid the erosion of rights that may result from inaction. Likewise, most alleged infringers are not acting in bad faith. In fact, many act out of ignorance of the law or a misunderstanding of the scope of the owner's trademark rights.[44]

Thus, when it comes to the reasonableness of enforcement efforts, what is considered reasonable will usually depend on which side of the action an entity sits. While those on the receiving end of enforcement actions may view them as coercive or an unjustifiable exercise of the mark owner's rights, the mark owner typically views these actions as legitimate and necessary to protect its rights.[45]

Mark owners may, however, sometimes be too zealous and end up overreaching.[46] Sometimes they may have an over-inflated view of the strength of the mark and thus the scope of their rights (e.g., they consider their mark famous when it may not actually qualify as famous).[47] Other times, they mistakenly believe that to preserve the strength of their mark they must object to *every* third-party use of the same or similar mark, no matter whether such uses may be fair uses or otherwise non-infringing. They may lose sight of the fact that the effectiveness of enforcement is not measured by how frequently they enforce, but rather by the effect that taking or failing to take action has in the marketplace. "The real question is public perception of plaintiff's mark, not a battle count of how often it has sued others."[48]

---

[44] While no legal requirement exists to search a mark's availability before adopting it, it generally makes business sense to do so, as it can save time and money by eliminating potential marks that are, for one or more reasons, problematic (e.g., an identical or highly similar mark is already registered or in use for identical or closely related products or services) and reduce the chance of being on the receiving end of an enforcement action. Sometimes, smaller or less experienced businesses skip this crucial clearance step and later learn as a result of an enforcement action that their chosen mark is not available. *See generally* 1 Gilson § 3.01[2].

[45] *See, e.g., Procter & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F. Supp. 1185, 1207 (S.D.N.Y. 1980) (in a suit where the mark owner lost, the court noted: "[Procter & Gamble] cannot be faulted for zealously protecting [its] trademark interest. Indeed, the trademark law not only encourages but requires one to be vigilant on pain of losing exclusive rights. . . . [I]n going to war . . . P & G was entitled to use all the ammunition it had."), *aff'd without op.*, 636 F.2d 1203 (2d Cir. 1980); *see also Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 34 (1st Cir. 2002) (noting that a mark owner's "failure to enforce their rights may result in the weakening of these rights over time").

[46] *See* 6 McCarthy § 31:100 (providing the author's views regarding indiscriminate enforcement efforts).

[47] *See e.g., Esquire, Inc. v. Esquire Slipper Mfg. Co., Inc.*, 243 F.2d 540, 545 (1st Cir. 1957) (observing that an owner's zeal in enforcing its mark "may not have been justified by the mark's intrinsic strength, but its zeal may well have been born of over-enthusiasm for its relatively weak mark rather than an attempt to browbeat and coerce."); *see also* 6 McCarthy § 31:101.

[48] 2 McCarthy § 11:91.

## 2. Examining the Scope of the Asserted Problem

Abusive litigation tactics, in the sense of those tactics employed in litigating a civil action through to trial in district court, do not appear to be a significant problem, since historically only approximately 1.5% of all trademark cases filed ever reach trial and the majority are disposed of before a case reaches the pretrial phase.[49]  To the extent trademark owners engage in tactics unwarranted by a reasonable interpretation of the scope of the rights they actually possess, it would appear the root of any problem that may exist are the tactics engaged in during pre-litigation or pre-trial enforcement efforts.

Generally, information about pre-litigation enforcement efforts and pre-trial litigation tactics is not made public.  For example, the number of trademark-related cease-and-desist letters sent by mark owners is not publicly available.[50]  Nor are there reliable statistics on the size of the entities sending and receiving such letters or the number or percent that result in termination of use of the challenged mark.  Similarly, for those trademark disputes that do get decided by the courts, reliable data concerning the number of cases in which the challenger lost or in which attorneys' fees were awarded is not readily available.

Given the limited data available, it is extremely difficult to determine the extent to which trademark owners may be purposefully overreaching when enforcing their rights, and doing so with sufficient regularity for it to qualify as a significant problem.  It is even more difficult to determine whether alleged coercive litigation tactics are disproportionately used against small businesses or whether such tactics have a more harmful impact on small businesses.  For this reason, the USPTO solicited public comments to better assess the existence of and/or extent of this problem.

## 3. Soliciting Public Comment

In connection with the commissioned study, USPTO requested feedback from U.S. trademark owners, practitioners, and others regarding their experiences with litigation tactics, especially those involving an attempt to enforce trademark rights beyond a reasonable interpretation of the scope of the owner's rights.

The USPTO posted a notice requesting comments on the USPTO web site in early October 2010.[51]

---

[49] *See* http://www.uscourts.gov/Statistics/FederalJudicialCaseloadStatistics.aspx (publishing tables from 2001 to 2010 of Federal Judicial Caseload Statistics; Table C-4 sets forth cases terminated, by nature of suit and action taken).

[50] We note that the Chilling Effects Clearinghouse, http://www.chillingeffects.org/, a joint project of the Electronic Frontier Foundation and Harvard, Stanford, Berkeley, University of San Francisco, University of Maine, George Washington School of Law, and Santa Clara University School of Law clinics, is actively compiling a database of cease-and-desist letters alleging trademark rights violations.

[51] It is noted that in USPTO's request for comments posted on October 6, 2010, the term "bullies" was used and described as "a trademark owner that uses its trademark rights to harass ad intimidate another business beyond what the law might be reasonably interpreted to allow."  The posting was later amended to remove the terminology "bullies" and "bullying," as it was determined that it was more appropriate to use the language appearing in the Trademark Technical and Conforming Amendment Act of 2010; namely, "litigation tactics."

Notice of USPTO's request for comments was also posted on the www.StopFakes.gov web site. Additionally, through the National Institute of Science and Technology's (NIST) Manufacturing Extension Partnership (MEP), the Notice was sent to small businesses around the U.S., as well as to manufacturing assistance centers for dissemination via their list servers. The Notice was also sent to thousands of USPTO stakeholders via the USPTO's independent inventor newsletter, *The Inventor's Eye*.

The USPTO also coordinated with the U.S. Commercial Service, the trade promotion "arm" of the U.S. Department of Commerce's International Trade Administration, to hold a roundtable on Trademark Litigation Tactics on February 10, 2011, in Detroit, Michigan. The roundtable, titled "Is There a Bull in the Trademark Shop?," was held at Wayne State University in Detroit, Michigan, and was part of a day-long seminar designed to educate small businesses about protecting intellectual property in the global marketplace. Attending the roundtable were senior staff from the USPTO as well as law students, practitioners, and several small business owners located in the Michigan area. During the roundtable, the importance of the study was discussed and all attendees were encouraged to provide feedback about their own trademark litigation experiences. Additional topics covered during the discussion and raised by way of audience questions/participation included trademark selection strategies, social media's role in influencing the debate, and tips on how to avoid trademark litigation.

In addition, USPTO reached out to the U.S. Small Business Administration's (SBA's) Office of Advocacy which scheduled a roundtable on this subject. However, the roundtable was canceled due to a lack of participant interest.

The period for responding to the USPTO's request for comments was originally scheduled to close on January 7, 2011, and was subsequently extended through February 14, 2011. At the close of the four-month comment period, 79 comments were received. The questions posed and the comments received are discussed below.

### a. Questions Posed

The USPTO formulated its request for comments to gain both opinions and accounts of personal experiences relating to trademark enforcement and litigation tactics. The questions also sought to address each of the variety of forums in which such tactics may arise. In addition, USPTO's request welcomed suggestions to address any additional perceived problems.

The following questions were posed:

1.  Please identify whether you are a trademark owner or practitioner, and the general size and nature of your business or trademark practice, including the number of trademark applications and registrations your business has, or your practice handles. Please note that USPTO will fully consider any comments you submit, even if you choose not to identify yourself in a particular manner.

2.  In approximately the last 5 years, please describe any instances of which you have first-hand knowledge where a small business may have been the target of litigation tactics attempting to enforce trademark rights beyond a reasonable interpretation of the scope of the rights granted to the trademark owner.

16

3.  Please describe situations where you have been involved in receiving a cease-and-desist letter.  Anecdotal information might include, but is not limited to, a description of whether the letter resulted in the small business ceasing its use of one or more marks, or whether the sender of the cease-and-desist letter withdrew or abandoned its demands against the small business owner.

4.  Please describe situations where you have been involved in trademark litigation in state or Federal courts.  Anecdotal information might include, but is not limited to, a description of whether the lawsuit settled on the basis of the small business agreeing to cease its use of one or more marks, or on the basis of the plaintiff withdrawing or abandoning its trademark-related allegation(s).  Alternatively, relevant information might include whether such lawsuits resulted in a court judgment and the nature of the judgment (such as requiring the small business to cease its use of one or more marks, assessing monetary liability (damages, lost profits, or attorneys' fees) against the small business, requiring the plaintiff to pay the defendant's attorneys' fees, or imposing sanctions against the plaintiff under Rule 11 of the Federal Rules of Civil Procedure).

5.  Please describe situations where you have been involved in opposition or cancellation proceedings instituted at the USPTO against small business owners.  Anecdotal information might include, but is not limited to, a description of whether the proceedings settled on the basis of the small business agreeing to abandon its application(s) for one or more marks, or whether the proceedings settled on the basis of the plaintiff withdrawing or abandoning its notice of opposition or cancellation petition.  Alternatively, relevant information might include a description of whether such proceedings resulted in a decision by USPTO Trademark Trial and Appeal Board (TTAB) refusing to register/canceling one or more marks owned by the small business, or whether such proceedings resulted in the TTAB imposing sanctions against the plaintiff under Rule 11 of the Federal Rules of Civil Procedure.

6.  Do you think trademark owners currently encounter the problem of other trademark owners using their trademark rights to harass and intimidate another business beyond what the law might be reasonably interpreted to allow?  If so, how significant is the problem?

7.  Do you think aggressive litigation tactics are more pervasive in the trademark area than in other areas of the law?

8.  Do you think USPTO has a responsibility to do something to discourage or prevent aggressive trademark litigation tactics?   If yes, what should USPTO do?

9.  Do you think U.S. courts have a responsibility to do something to discourage or prevent aggressive trademark litigation tactics?  If yes, what should U.S. courts do?

10.  What other U.S. agencies may have a responsibility to do something about the problem?

11.  Do you think Congress has a responsibility to do something to discourage or prevent aggressive trademark litigation tactics?   If yes, what should Congress do?

12.  Please provide any other comments you may have.

### b.      Comments Received

In response to the request for comments, USPTO received feedback from 79 interested parties. The comments reflected a diverse range of views.  Of the 79 comments received, 33 were from small business owners, 13 were from attorneys, 4 were from professors, 2 were from attorneys on behalf of small business owners, 4 were from intellectual property organizations, including one that surveyed its membership and reported the results, and 23 were from other interested parties. Comments were received from major intellectual property stakeholder organizations, including the American Bar Association Intellectual Property Law Section, the American Intellectual Property Law Association, the International Trademark Association, and the Intellectual Property Owners Association.  The American Bar Association Intellectual Property Law Section surveyed its membership on aggressive litigation tactics using its own questions, and over 270 members appear to have responded to the organization's survey.  In summarizing the results of its survey, the organization noted that aggressive litigation tactics appear not to be unique to the trademark field, that judges should address any problems with such tactics in particular cases in lieu of any systemic attempt to address the problems, and that the consensus of those surveyed was that no legislative action is needed.

Most of the direct respondents claimed at least some degree of first-hand knowledge of instances where unduly aggressive trademark litigation or pre-litigation tactics (e.g., cease-and-desist letters) were targeted at a small business.  Many of these were directly involved in the issuance or receipt of cease-and-desist letters.  Significantly, relatively few had direct experience with litigation in the courts or USPTO's Trademark Trial and Appeal Board (TTAB).  When asked if they currently encounter the problem of other trademark owners using their trademark rights to harass and intimidate another business beyond what the law might be reasonably interpreted to allow (e.g., is "trademark bullying a problem"), few commenters explicitly addressed whether and to what extent this issue is a significant problem.  Given the limited number of comments and the varied nature of the commenters own experiences, the comments may be better viewed as anecdotal.



### (i)      Cease-and-Desist Letters and Pre-Litigation Issues

With respect to cease-and-desist letters, many of the comments acknowledged regular use of these letters in the trademark field.  A handful of small business owners explained that they withdrew their trademark applications after receiving a cease-and-desist letter because they lacked the time or financial resources to litigate against a larger, wealthier company.  This imbalance of resources was a common theme among many of the comments concerned with the threat of litigation, including one noting that litigation is too expensive to be a realistic option for many small businesses.[52]  Other commenters, however, recognized that cease-and-desist letters

---

[52] According to the AIPLA Report of the Economic Survey, 2009, trademark infringement litigation costs total on average $384,000 when less than $1 million is at issue, $857,000 when $1-$25 million is at issue and $1,746,000 when over $25 million is at issue.

have a legitimate purpose, explaining that most are sent in good faith, and only a small percentage result from overzealous protection of a mark. Some commenters explained that trademark owners have an obligation to police their marks, and the cease-and-desist letter is a necessary, cost-effective part of the process.

### (ii)     Actual Litigation Issues

Regarding actual litigation experiences, some of those relative few with direct experience on the subject opined that discovery and deposition processes were too costly for many small businesses and provided a means for a party to thwart progress in a case and to drain resources from an adversary. In contrast, others recognized that in Federal court proceedings, Rule 11 of the Federal Rules of Civil Procedure provides an effective mechanism to combat overreaching.

Some of these commenters with direct litigation experience expressed concern that all the safeguards present in Federal courts are not available in TTAB proceedings. Specifically, one commenter contrasted the power of a Federal judge to hold a party accountable and impose sanctions for bad conduct with the more limited array of options available to a TTAB judge to combat overreaching in TTAB litigation. Other commenters provided a different viewpoint and stated that both the courts and TTAB offer effective options to combat bad conduct and stressed the need to better educate the public and small business owners about legal protections already built into the system.[53]

### (iii)     How Tactics in IP Cases Compare to Other Types of Cases

The American Bar Association Intellectual Property Section inquired in its survey if aggressive litigation tactics are more pervasive in the trademark area than in other areas of the law. Of the 196 respondents to this question, 44% opined that aggressive litigation tactics are no more or less pervasive in trademark law than in other areas of the law.

---

[53] There are similarities and differences between district court and TTAB proceedings. For example, both the TTAB and courts apply Federal Rule 11. But unlike the courts, the TTAB does not make awards of costs and fees.

The responses to USPTO's request for comments reflected mixed viewpoints on whether aggressive litigation tactics are more pervasive or worse in the trademark realm than in other areas. Many conceded a lack of perspective to compare various areas of law. Several commenters stressed that allegations of improper litigation tactics are not unique to trademark law, and a minority of respondents noted that they do not believe a problem exists in trademark



enforcement litigation. For example, one attorney noted, "Many areas of civil law could be described as aggressive (i.e., insurance defense, medical malpractice, product liability). It is unreasonable and unwarranted to target the area of trademark law. Much of trademark litigation is not so much 'aggressive' as it is necessarily proactive." One comment also noted that the presence of social media, and the potential publicity generated thereby, reduces the incidence of improper conduct. This comment raises the question whether, and suggests the possibility that, social media web sites act as checks on overzealous litigation because users of social media reveal and publicize the identities of alleged overreachers. However, a number of commenters on this issue opined that aggressive tactics are more prevalent in the trademark area, with multiple comments indicating that some trademark owners seem to feel compelled to challenge *all* uses of their marks.

### (iv)     Size and Resource Imbalances

One commenter acknowledged that trademark owners should have the right to protect their marks, but stated that the aggressive tactics used by overreachers presents a problem for the entire intellectual property community by threatening legitimate activities and clogging the legal system with invalid claims. Another commenter noted that "small companies and individuals are placed in a difficult position where surrender of valid trademarks that are being lawfully used is the only rational financially-feasible option available." Yet another party explained that this is a growing problem within the field of trademarks and that the parties engaging in improper conduct are not limited to parties of any particular size, with both large and small businesses on both sides of the proceedings. One small business owner explained that overreaching with claims can sometimes lead to the demise of a business, as the potential costs for rebranding can force a small business out of the marketplace.[54]

### (v)     Suggestions for USPTO or TTAB Actions

Even though relatively few respondents had direct experience with litigation in the TTAB or the courts, many nonetheless provided suggested actions for USPTO and TTAB, or the courts, to consider. Most commenters opined that USPTO has a responsibility to do something to discourage or prevent aggressive trademark litigation tactics, with a minority stating that this

---

[54] According to the *AIPLA Report of the Economic Survey*, 2009, on average, law firms charge $1,440 to perform a trademark clearance search, analysis, and opinion, $867 to prepare and file a trademark application, and $1,678 for prosecution of a trademark registration. These costs are in addition to a wide variety of advertising or marketing expenses used to promote a mark.

should be left to the courts. Some commenters expressed the viewpoint that the issue was the sole responsibility of the USPTO.

Many commenters suggested that the TTAB amend its rules to provide for sanctions against such tactics and to proactively prevent such tactics. One commenter proposed additional scrutiny for parties "known to use" such tactics and another proposed that USPTO substantially increase fees for filing oppositions and cancellations, with a reduced fee for smaller entities. Others proposed that the agency encourage settlement agreements to lessen the burden on the parties, and closely monitor the progress of proceedings to prevent undue delay and costs, with one commenter opining that the duration of the average *inter partes* proceeding is a powerful incentive for a small business to concede.



The comments included several suggestions that USPTO raise awareness of the protections available from and provide information on how to respond to aggressive tactics.

### (vi) Suggestions for the Courts

Turning to the courts, the majority of commenters with suggestions for improvements took the position that courts also bear a responsibility to discourage or prevent aggressive litigation tactics. Specific suggestions ranged from proposals that attorneys' fees and sanctions should be more readily assessed, to a proposal for *pro bono* legal counsel for small businesses, to a proposal that the court system provide an initial screening of claims to reject frivolous lawsuits at the outset. Those holding the minority view either believe no problem exists with the current system or that the courts already have tools to effectively deal with such overreaching tactics. One comment noted that although existing remedies are available, courts are generally reluctant to use them. Rather than invoking a "one size fits all" approach, one comment expressed that "curbing abusive trademark litigation practices should be left to the judiciary on a case-by-case basis."

### (vii) Suggestions for Other Federal Agencies, Non-Federal Organizations, and Congress

Many commenters proposed the involvement of other Federal agencies to help address these issues, including the U.S. Department of Justice, U.S. Department of State, U.S. Customs and Border Protection, U.S. Small Business Administration (SBA), Federal Communications Commission (FCC), and Federal Trade Commission (FTC). One commenter suggested a hotline monitored by the FTC or USPTO. Others also proposed involvement from bar associations, the SBA, and the Better Business Bureau to help educate small businesses and assist in these types of difficult situations.

Finally, most commenters opined that Congress has a responsibility to discourage or prevent aggressive trademark litigation tactics, with a minority noting that there is no problem to address or that the issue does not require legislative action.

Many respondents expressed concern that the Federal trademark anti-dilution laws may be abused where the asserted marks have very dubious claims to the "famous" status required for such claims.

As stated in one comment, if every trademark owner utilized aggressive litigation tactics, including cease-and-desist letters, "under the presumption that its marks were 'famous,' then those marks would for all practical purposes be 'trademarks in gross,' enforceable as to all goods and services." Some commenters therefore proposed that the anti-dilution laws be amended to prevent such misuse.

One commenter proposed that Congress enact legislation providing standards for sending cease-and-desist letters. Another respondent suggested that Congress amend the Trademark Act to eliminate the current provision for the registration of descriptive terms that have acquired distinctiveness, so that descriptiveness would constitute an absolute bar to registration. Yet another argued for legislative reform to prevent any trademark protection of common terms or phrases. Several comments proposed Congressional hearings on these issues.

One comment proposed legislative reform to address trademark use in the context of artistic works, noting the lack of a statutory affirmative defense to trademark infringement that would protect this type of use. The commenter opined that such legislative reform could prevent many improper trademark claims against artists. Finally, another commenter proposed that Congress codify a trademark misuse defense to allegations of trademark infringement, so that courts could dismiss lawsuits when it is demonstrated that the plaintiff is attempting to use its mark for anti-competitive purposes or otherwise in violation of the law.



## III. Federal Government Resources to Protect Intellectual Property and Prevent Counterfeiting

Start-up businesses and small and medium-sized enterprises (SMEs) are principal sources of innovation and are vital to U.S. economic growth. Statistics show that small businesses created more than 5.5 million new jobs in the United States during the 1990s. In the current global economy, protecting innovations in the United States and abroad is important for small businesses as they seek to develop a market presence overseas. The United States Government has many resources available to assist SMEs with intellectual property issues. Those resources that relate to trademark protection and counterfeit prevention in the U.S. market are discussed in this section of the report.

The Department of Commerce's International Trade Administration's (ITA) Office of Intellectual Property Rights (OIPR) and U.S. and Foreign Commercial Service (USFCS) work with U.S. firms to help them protect their intellectual property domestically and abroad by offering comprehensive, customized solutions to international trade challenges. The USPTO, responsible

for granting and administering patents and trademarks, works with SMEs to assist them in protecting their intellectual property. Other Federal Government entities, including the U.S. International Trade Commission (USITC) and the Small Business Administration (SBA), all work to protect and enforce intellectual property on behalf of all intellectual property rights (IPR) stakeholders. The National Intellectual Property Rights Coordination Center (IPR Center) works to deter, interdict, and investigate threats arising from the movement of illegal goods into and out of the United States. Collectively, the Federal agencies discussed below work together to assist small businesses in protecting and enforcing their intellectual property, including trademarks.

A.    **Department of Commerce's International Trade Administration's Office of Intellectual Property (OIPR)**

The Department of Commerce (DOC) has undertaken numerous activities to assist SMEs in protecting and enforcing IPR, both in the United States and abroad. OIPR develops and coordinates ITA input on trade-related intellectual property rights policies, programs and practices, and assists companies to overcome challenges to protecting and enforcing their IPR.

**StopFakes.gov:** The most comprehensive tool available to assist SMEs is the StopFakes.gov web site. ITA, on behalf of U.S. intellectual property agencies, launched the web site (www.StopFakes.gov) in 2004 to provide updates and links to Executive Branch IPR programs. ITA continues to manage this resource, which houses useful information for SMEs.

**(1-866-999-HALT):** The DOC manages a hotline under the Strategy for Targeting Organized Piracy (STOP) initiative to help SMEs protect their intellectual property rights in the United States and abroad. This hotline is answered by USPTO experts, who work with OIPR to help businesses secure and enforce their IPR, including by ensuring that U.S. businesses enjoy the full benefits of bilateral and multilateral IPR related trade agreements.

**Online SME IPR Training Modules:** OIPR worked with the USPTO, the SBA, and the Foreign Commercial Service (FCS) to develop an online training program for SMEs to learn how to evaluate, protect, and enforce their IPR. The program is available for free online at www.StopFakes.gov. The module has been translated into Spanish and French to broaden our domestic and foreign outreach with this tool.

**Outreach and Seminars:** OIPR regularly conducts outreach and training events about how companies can protect and enforce IPR in the U.S. and overseas. Outreach events are conducted in-person and via webinar.

**Protecting IPR at Trade Fairs:** The DOC developed a program to promote IPR protection at domestic and international trade fairs. The DOC is educating trade fair attendees, exhibitors, and organizers about the value of IPR, raising awareness of IPR issues at trade fairs, and promoting IPR protection at trade fairs and pavilions that the DOC operates, certifies, or supports.

B.    **United States Patent and Trademark Office**

**Trademark Resources:** The USPTO web site contains considerable information on the trademark searching, prosecution, and maintenance process. USPTO's Trademark Assistance Center provides general information about the trademark registration process and responds to inquiries about the status of trademark applications and registrations. This information is also available on the USPTO web site through which SMEs can access the Trademark Electronic Search System to search for potentially conflicting federally registered marks and pending

applications.  The USPTO posts on its home page information about TTAB proceedings, including information about the Board's Accelerated Case Resolution, arbitration, and mediation options.

**IPR Awareness:**  The USPTO offers several IPR awareness programs that are tailored to the most critical IP issues for small businesses.  For example, since 2005, USPTO has offered free Intellectual Property Awareness Campaign (IPAC) "IP Basics" programs to more than 1,000 SMEs in various cities throughout the U.S.  These events include presentations on how to protect and enforce trademarks domestically and internationally.  USPTO also offers China "Road shows" to businesses throughout the U.S.  In addition, USPTO Global Intellectual Property Academy (GIPA) has produced six modules on intellectual property protection and enforcement in five languages; namely, English, Spanish, French, Arabic, and Russian.  These web-based seminars cover all areas of intellectual property protection, including trademarks and geographical indications.

**Patent Trademark Depository Libraries (PTDL):**  The USPTO has a network of Patent Trademark Depository Libraries (PTDL), which are a rich local resource for small businesses, research and development firms, university and governmental laboratories, and independent inventors and entrepreneurs.  Services at the libraries are free, and include assistance in accessing and using patent and trademark documents, training on USPTO databases, obtaining access to the USPTO web site, and hosting public seminars on intellectual property topics for novice and experienced innovators.  There are 82 PTDLs in 46 states, the District of Columbia, and Puerto Rico.

## C.      Department of Commerce's CommerceConnect

Announced in 2009, CommerceConnect is a one-stop-shop initiative in which Commerce Department employees are cross-trained so that they can connect firms to the full menu of Commerce programs and can link business owners with other Federal, state, local, and nonprofit resources.  The effort is designed to cut through red tape and simplify access to services and resources that can help companies grow, create jobs, and become more efficient. CommerceConnect offers an integrated and comprehensive portfolio of Federal, state, local, and non-profit business assistance resources including more than 70 U.S. Department of Commerce programs -- many at no cost to U.S. entrepreneurs and businesses.  Trained CommerceConnect specialists can assess clients' business needsI -- including issues related to intellectual property protection -- and refer them to appropriate resources.

## D.      U.S. Small Business Administration

SBA provides non-monetary support to small businesses to assist them in developing their businesses.  SBA partners with a non-profit organization known as Service Corps of Retired Executives (SCORE).  SCORE members are trained to serve as counselors, advisors, and mentors to aspiring entrepreneurs and business owners.  These services are offered at no fee as a community service.  As part of this association, retired executives assist entrepreneurs and small businesses in the formation and growth of their enterprises.  There are 389 SCORE chapters in urban, suburban, and rural communities in the U.S. and U.S. Territories.  Through SBA's partnership with SCORE, businesses may use SCORE's web site to identify potential mentors on "intellectual property," "patents," "trademarks," and "copyright" subject areas.  Through their ASK SCORE online program, online workshops on IPR are available and users can connect with successful executives with a breadth of experience in intellectual property issues.

### E. U.S. International Trade Commission

The U.S. International Trade Commission (USITC) investigates claims regarding intellectual property rights violations stemming from importation of goods, including allegations of patent and trademark infringement.  Section 337, 19 U.S.C. § 1337, declares it unlawful to import items that infringe utility and design patents, as well as registered and common law trademarks, and registered copyrights.  USITC provides information on Section 337 at www.usitc.gov/trade_remedy/int_prop/index.htm.  USITC also has a Trade Remedy Assistance Office (TRAO) that provides information to small businesses concerning the remedies and benefits available under U.S. trade laws and assists eligible small businesses in preparing and filing a Section 337 complaint.

### F. National Intellectual Property Rights Coordination Center

The National Intellectual Property Rights Coordination Center (IPR Center) is a task force that uses expertise of its member agencies to share information, develop initiatives, and conduct investigations related to intellectual property theft.  As an integrated task force, the IPR Center uses the expertise of its member agencies to share information, develop initiatives, coordinate enforcement actions, and conduct investigations related to IP theft. The IPR Center is accessible to users, including members of the general public, industry, trade associations, law enforcement, and government agencies.  All of the said entities are encouraged to report violations of intellectual property rights through the IPR Center web site. The information provided is reviewed by IPR Center staff and disseminated for appropriate investigative response and tactical use to IPR Center partners.

The units have embedded interagency representation from the following key investigative authorities:

- U.S. Immigration and Customs Enforcement;
- U.S. Customs and Border Protection;
- Federal Bureau of Investigation;
- Food and Drug Administration-Office of Criminal Investigations;
- U.S. Postal Inspection Service;
- Department of Commerce International Trade Administration;
- United States Patent and Trademark Office; and
- Government of Mexico Tax Administration Service.

The IPR Center also coordinates and provides domestic and international IPR outreach and training to law enforcement, industry, and the public.  For example, Operation Joint Venture conducts outreach and disseminates information to private industry regarding IPR issues.

## IV.    Recommendations[55]

After careful review of the available information regarding trademark litigation tactics and comments received from concerned intellectual property stakeholders, it is unclear whether small businesses are disproportionately harmed by enforcement tactics that are based on an unreasonable interpretation of the scope of an owner's rights.  Indeed, the 79 comments received in response to USPTO's request for comments reflected a diverse range of views on the subject, yet few explicitly addressed whether and to what extent unreasonable enforcement of trademark rights is a significant problem.

Ultimately, because trademark enforcement is a private property rights litigation issue, if abusive tactics are a problem, such tactics may best be addressed by the existing safeguards in the litigation system and by private sector outreach, support and education relating to these issues. However, to the extent small businesses are disproportionately adversely affected by such tactics because they lack the funds to hire counsel to defend against them, the Department of Commerce, in consultation with the Intellectual Property Enforcement Coordinator, will undertake the following actions:

- Engage the private sector about providing free or low-cost legal advice to small businesses via *pro bono* programs and IPR clinics;

- Engage the private sector about offering continuing legal education programs focused on trademark policing measures and tactics; and

- Enhance Federal agency educational outreach programs by identifying resources that enable small businesses to further their understanding of trademark rights, enforcement measures, and available resources for protecting and enforcing trademarks.

Each of these recommendations is discussed below.

### A.    Intellectual Property Rights Counseling for Small Businesses

As our research and several submissions point out, there are sufficient mechanisms in place to deter or punish those who resort to abusive trademark litigation tactics.  Specifically, attorneys' fees appear to be a deterrent to trademark litigation abuse because trademark owners know that a successful defendant may recover legal fees where the plaintiff's allegations of trademark infringement are so baseless as to be frivolous.

From the submissions, it seems that the costs associated with securing trademark counsel to respond to trademark enforcement efforts has the greatest negative impact on small businesses. For example, the expense of hiring an attorney to challenge a frivolous cease-and-desist letter may be too much for a small business to absorb, or the esoteric issues may simply be too daunting, thereby preventing the small business from even attempting to mount an entirely legitimate challenge to a threat of litigation.  In such cases, small businesses may instead chose to

---

[55] Although the legislation called on the Secretary of Commerce and the IPEC to make any "policy recommendations" they deemed appropriate, the Department of Commerce herein commits to adopt policies it has identified as likely to assist trademark owners enforce their rights reasonably and assist small businesses navigate these complex intellectual property issues.

give in to the trademark owner's baseless demands without a fight. We conclude, therefore, that small business owners could benefit from private sector programs offering low-cost or free trademark advice to help them respond to frivolous claims of trademark infringement.

The Department of Commerce, in consultation with the Intellectual Property Enforcement Coordinator, will engage stakeholders and bar associations to investigate the possibility of the private sector providing comprehensive low-cost or *pro bono* legal assistance to small business owners to help them respond to frivolous claims of trademark infringement. An example of an existing program on which such an initiative could be modeled is the one offered by the Export Legal Assistance Network (ELAN), a program established by the Federal Bar Association to offer free export legal advice, and supported by the U.S. Department of Commerce and the U.S. Small Business Administration. Through this program, small businesses can obtain an initial legal consultation from knowledgeable lawyers versed in the legal aspects of international trade free of charge. Applying this model to the present facts, knowledgeable trademark lawyers could provide legal advice to small businesses at a reduced rate or free of charge to help them determine if a claim of trademark infringement has any merit and, in cases where the claim is baseless, to help them formulate a response.

In addition, the Department of Commerce, in consultation with the Intellectual Property Enforcement Coordinator, will engage in discussions with universities, bar associations, and intellectual property rights organizations regarding development of additional *pro bono*/legal clinic IPR programs geared specifically toward small business owners and independent inventors. Such clinics can provide low-cost or free trademark advice to help small businesses respond to frivolous claims of trademark infringement, and should be considered as well. For example, USPTO is considering expansion of its already established law school clinic program. In August 2008, the USPTO launched a Law School Clinical Certification Program that allows law students to practice before the Agency in patent and trademark prosecution matters under the strict guidance of a Law School Clinical faculty Supervisor. Currently, 15 schools in the program offer trademark prosecution services. In the first year of the program, students filed a total of 37 trademark applications on behalf of clinic clients. Given the success of this pilot, USPTO is investigating additional *pro bono* models that will expand assistance.

### B. Engage the Private Sector about Offering Continuing Legal Education Programs Focused on Trademark Policing Measures and Tactics

As noted above, trademark owners are under an obligation to protect their trademarks, because if the owner does not police the relevant mark and enforce its rights against infringers, the strength and value of the mark could be diminished. As the submissions indicate, many skilled practitioners believe that under existing case law they are obliged to err on the side of sending a cease-and-desist letter to protect their clients' rights. Evaluating when a cease-and-desist letter is necessary and the demands such a letter should contain can be a difficult decision.

Increasing efforts to educate trademark lawyers about how to appropriately protect a client's mark can help address this problem and reduce the number of inappropriate cease-and-desist letters. We note that the intellectual property bar associations have the expertise and infrastructure to provide continuing legal education programs to lawyers dealing with the issues of infringement and proper protection of trademark rights, including best practices for cease-and-desist letters.

Accordingly, the Department of Commerce, in consultation with the Intellectual Property Enforcement Coordinator, will convene a meeting of interested stakeholders, including interested

intellectual property bar associations, to discuss the feasibility of providing continuing legal educational programs focused on trademark policing measures and tactics.

> **C.  Educate Small Businesses about Intellectual Property Rights and Available Protection and Enforcement Resources**

The Department of Commerce, in consultation with the Intellectual Property Enforcement Coordinator, will work to enhance educational outreach to provide small businesses with information about intellectual property rights and to identify resources they need to protect and enforce such rights.

Educating small businesses about the IP system at large, both in the United States and abroad, and about Federal Government resources available to assist them in the IP context, could help decrease the use and the effectiveness of any overly aggressive trademark litigation tactics, and would be responsive to the public input received. IPR awareness was repeatedly highlighted by commenters as an area where small businesses need assistance and look to the Federal Government more generally for guidance. A number of comments reflected or suggested the need for many small businesses to build a better understanding of trademark rights and the relevant legal framework. Achieving better IPR awareness could favorably impact litigation tactics from the perspective of an enforcer, who may benefit from understanding that some situations do not merit the use of aggressive litigation tactics and that the law may not require them. Another favorable impact could stem from a better educated accused infringer, who may benefit from background knowledge to assess the propriety of the accused use and to understand the rationale behind the trademark enforcement efforts taking place. Thus, the Department of Commerce will take steps to increase awareness of resources available to small businesses to help them obtain and protect their intellectual property rights.

## Appendix A: USG Resource Contact Information Sheet

- STOP Hotline at 1-866-999-HALT.

- "SME IP Training Tutorial" an online training tool for SMEs
  http://www.StopFakes.gov/525/menu/index.htm.

- "APEC Intellectual Property Explorer," tool helps businesses identify their intellectual
  property assets, http://www.stopfakes.gov/.

- "Experts' Advice for Small Businesses Seeking Foreign Patents" (GAO Report),
  http://www.gao.gov/new.items/d03910.pdf.

- USPTO Inventors Assistance, http://www.uspto.gov/inventors/iac/index.jsp; FAQs,
  http://www.uspto.gov/inventors/independent/index.jsp; and computer-based training,
  "From Concept to Protection," http://www.uspto.gov/inventors/index.jsp

- USPTO "TMIN," the Trademark Information Network, which features broadcast-style
  videos that cover important topics and application filing tips,
  http://www.uspto.gov/trademarks/process/TMIN.jsp

- "International IP Advisory Program", through which U.S. small businesses can obtain
  one hour of *free* legal advice on their IP issues in various countries,
  http://www.stopfakes.gov/int_ipr_ap.asp

- U.S. Copyright Office website for registration and general information (including
  Circular 1, "Copyright Basics"): http://www.copyright.gov,

- USITC's Trade Remedy Assistance Office (TRAO): online
  www.usitc.gov/trade_remedy/trao , by telephone at (800) 343-9822 or
  (202) 205-2200, or by fax at (202) 205-2139.

A

**Appendix B:    Acronyms**

| | |
|---|---|
| AIPLA | American Intellectual Property Law Association |
| APEC | Asia-Pacific Economic Cooperation |
| DOC | Department of Commerce |
| FCS | Foreign Commercial Service |
| FTC | Federal Trade Commission |
| GIPA | Global Intellectual Property Academy |
| INTA | International Trademark Association |
| IPAC | Intellectual Property Awareness Campaign |
| IPEC | Intellectual Property Enforcement Coordinator |
| IPO | Intellectual Property Owner's Association |
| IPR CENTER | National Intellectual Property Rights Coordination Center |
| ITA | International Trade Administration |
| NTIA | National Telecommunications and Information Administration |
| OECD | Organization for Economic Cooperation and Development |
| OIPR | Office of Intellectual Property Rights |
| PTDL | Patent and Trademark Depository Library |
| SBA | Small Business Administration |
| SCORE | Service Corps of Retired Executives |
| SME | Small to Medium Sized Enterprise |
| TRAO | Trade Remedy Assistance Office (United States International Trade Commission) |
| TTAB | Trademark Trial and Appeal Board |
| USG | United States Government |
| USITC | United States International Trade Commission |
| USPTO | United States Patent and Trademark Office |
| USTR | United States Trade Representative |